# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————————

Maya Parizer, Adin Gess, Noach Newman, Natalie Sanandaji, Yoni Diller, David Brombert, Lior Bar Or, Ariel Ein-Gal, and Hagar Almog,

Plaintiffs-Appellants,

v.

AJP Educational Foundation, Inc. a/k/a American Muslims for Palestine, National Students for Justice in Palestine, WESPAC Foundation, Hatem Bazian, Osama Abuirshaid, Taher Herzallah, and Zarefah Baroud,

Defendants-Appellees.

———————————

On Appeal from the United States District Court for the Eastern District of Virginia No. 1:24-cv-00724

———————————

## APPELLANTS' OPENING BRIEF

———————————

Jason B. Torchinsky
Elizabeth Price Foley
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, NW
Suite 643
Washington, DC 20037
(202) 737-8808

*Additional counsel listed in signature*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

DISCLOSURE STATEMENT ....................................................... 1

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF THE ISSUES ................................................... 1

PERTINENT STATUTES, RULES, AND REGULATIONS ................... 2

STATEMENT OF THE CASE ...................................................... 2

   A.   Factual Background ...................................................... 2

   B.   Procedural Background ................................................. 5

SUMMARY OF THE ARGUMENT ............................................... 8

STANDARD OF REVIEW .......................................................... 11

ARGUMENT .......................................................................... 11

   I.   The district court erred in dismissing the U.S. Plaintiffs' ATA claims for failure to state a claim under Rule 12(b)(6) ...................... 11

      A.   The district court incorrectly interpreted *Taamneh* as requiring a strict nexus to establish aiding-and-abetting liability under the ATA ................................................ 15

      B.   Plaintiffs adequately allege knowing and substantial assistance to Hamas ....................................................... 24

      C.   *Halberstam* confirms that Plaintiffs have stated a claim for ATA aiding-and-abetting liability ................................. 41

   II.   The district court erred in dismissing the Israeli Plaintiffs' ATS claims for lack of subject matter jurisdiction under Rule 12(b)(1) ...... 50

      A.   The district court focused solely on the location of the Israeli Plaintiffs' injuries rather than the location of the "relevant conduct" constituting aiding and abetting ..................................................... 51

      B.   The district court applied the incorrect standard for aiding-and-abetting liability under international law ................. 59

      C.   The district court erred by failing to treat the Israeli Plaintiffs' injuries as ongoing ......................................... 63

CONCLUSION ....................................................................... 64

i

REQUEST FOR ORAL ARGUMENT.....................................................65

CERTIFICATE OF COMPLIANCE .....................................................67

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Al Shimari v. CACI Premier Tech., Inc.*,
758 F.3d 516 (4th Cir. 2014) ................................. 52, 53, 54, 55, 57, 58

*Boim v. Am. Muslims for Palestine*,
No. 17 C 3591, 2022 U.S. Dist. LEXIS 88508 (N.D. Ill. May 17, 2022)
.......................................................................................................27, 28, 29

*People v. Campbell*,
30 Cal. Rptr. 2d 525 (Cal. Ct. App. 1994) ....................................14, 35

*Davis v. Lafler*,
658 F.3d 525 (6th Cir. 2011) ..............................................................14

*Doe v. Cisco Sys.*,
73 F.4th 700 (9th Cir. 2023) ..............................................................60

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)
............................................ 17, 18, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50

*Illinois v. Holloway*,
475 N.E.2d 915 (Ill. App. Ct. 1985) .............................................14, 35

*Iowa v. Burton*,
24 N.W.3d 771 (Table), 2025 WL 1822514 (Iowa Ct. App. 2025)
.......................................................................................................14, 35

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ............................................................59

*Just. 360 v. Stirling*,
42 F.4th 450 (4th Cir. 2022) ..............................................................56

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ..............................................................17

*Khulumani v. Barclay Nat'l Bank Ltd.*,
504 F.3d 254 (2d Cir. 2007) ..............................................................60

*Kiobel v. Royal Dutch Petro. Co.*,
   569 U.S. 108 (2013) .......................................... 51, 52, 54, 57

*Mastafa v. Chevron Corp.*,
   770 F.3d 170 (2d Cir. 2014) ............................................54

*Missouri v. McGowan*,
   789 S.W.2d 242 (Mo. Ct. App. 1990) ...........................14, 35

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ......................................................54

*Oregon v. Holcomb*,
   268 P.3d 684 (Or. Ct. App. 2011) ...............................14, 35

*Philips v. Pitt Cnty. Mem'l Hosp.*,
   572 F.3d 176 (4th Cir. 2009) ...........................................59

*Sekhar v. United States*,
   570 U.S. 729 (2013) ......................................................16

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ......................................................60

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ,
   551 U.S. 308 (2007) ......................................................59

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023)
   ..................... 7, 8, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 44, 46, 48, 49

*United States ex rel. Rosales v. Amedisys N.C., LLC*,
   128 F.4th 442 (2d Cir. 2025) ...........................................56

*United States v. Garcia*,
   855 F.3d 615 (4th Cir. 2017) ...........................................56

*United States v. Hurley*,
   755 F.2d 788 (11th Cir. 1985) ....................................15, 35

*United States v. Seun Banjo Ojedokun*,
   16 F.4th 1091 (4th Cir. 2021) ..........................................11

*Washington v. Hou. Auth. of Columbia,*
   58 F.4th 170 (4th Cir. 2023) ..............................................11

**Statutes**

18 U.S.C. § 2333 ............................................. 2, 5, 16, 18, 23

28 U.S.C. § 1291 ...................................................................1

28 U.S.C. § 1331 ...................................................................1

28 U.S.C. § 1350 ...............................................................2, 5

**Rules**

Fed. R. Civ. P. 12 ............................. 1, 5,  7, 8, 11, 15, 19, 27, 29, 36, 50

**Other**

Carly Silver, Reporting Live From the First-Ever SJP Nat'l Conference,
NEW VOICES, (Oct. 15, 2011),
https://newvoices.org/2011/10/15/reporting-live-from-the-first-ever-sjp-
national-conference/.................................................................47

Columbia Heights, Minn., Parks & Recreation Comm'n,
https://www.columbiaheightsmn.gov/government/boards_and_commissi
ons/parks_and_recreation_commission.php ...........................56

Exec. Order No. 14,362, 90 Fed. Reg. 55033 (Nov. 28, 2025) ..................2

Joint Stipulation of Dismissal, Abu Irshaid v. United States Citizenship
& Immigr. Servs., No. 1:17-cv-402 (E.D. Va. Sept. 11, 2017), ECF No. 34
(dismissing Abuirshaid's lawsuit based on USCIS granting Abuirshaid
naturalization). .......................................................................56

Nat'l Conference: Students for Justice in Palestine (New York, 14–16
October, 2011), https://www.jadaliyya.com/Details/24307 .........................
.................................................................................................47

Office of the Minn. Sec'y of State, Elections & Voting, Results for
Selected Contests in Anoka Cnty., Cnty. Comm'r Dist. 7,
https://tinyurl.com/3zs78jx9....................................................56

*Prosecutor v. Popovic*, Case No. IT-05-88-A, Appeals Judgment (Int'l Crim. Trib. for the Former Yugoslavia Jan. 30, 2015). ..........................61

*Prosecutor v. Mrkˇsi´c*, Case No. IT-95-13/1-A, Appeals Judgment (Int'l Crim. Trib. for the Former Yugoslavia May 5, 2009) ............................61

UC-Berkeley, Dept' of Ethnic Studies, Hatem Bazian, https://tinyurl.com/4rjh5urp. ..................................................................56

Univ. of Hawai'i at Manoa, Ctr. for Biographical Rsch., Brown Bag Biography: Fall 2025.................................................................................57

Univ. of Hawai'i at Manoa, Faculty/Staff Directory, Zarefah R. Baroud, https://manoa.hawaii.edu/directory/index.php. .....................................57

Univ. of Minn., College of Liberal Arts, Am. Studies, Taher Herzallah, https://cla.umn.edu/american-studies/news-events/profile/taher-herzallah. ....................................................................................................57

# DISCLOSURE STATEMENT

Plaintiffs-Appellants filed the Disclosure Statement required by Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1 on November 25, 2025. Doc. 6. Plaintiffs-Appellants are not corporations, have no parent corporations, and issue no stock.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331. The court entered final judgment on October 15, 2025, JA192, and Appellants timely filed their notice of appeal on November 7, 2025. JA193. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

I.     Whether the district court erred in dismissing Plaintiffs' Antiterrorism Act aiding-and-abetting claim under Rule 12(b)(6) based on its conclusion that there is no "definable nexus" between Defendants' conduct and the October 7, 2023, massacre, or Defendants' knowledge of or intent to aid Hamas's acts of terrorism generally.

II.    Whether the district court erred in dismissing Plaintiffs' Alien Tort Statute claim for want of subject matter jurisdiction under Rule 12(b)(1) based on its conclusion that Plaintiffs did not allege sufficient

domestic conduct to overcome the presumption against extraterritoriality.

## PERTINENT STATUTES, RULES, AND REGULATIONS

This case requires the Court to construe the aiding-and-abetting liability provision of the Antiterrorism Act, 18 U.S.C. § 2333, as well as the Alien Tort Statute, 28 U.S.C. § 1350. These statutes are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

### A.    Factual Background

This case is about organizations (and leaders thereof) whose very creation and existence are intended to provide continuous, systematic, and substantial assistance to Hamas, a designated Foreign Terrorist Organization ("FTO"). First Am. Compl. JA099. Hamas was founded in 1987 as a splinter group from the International Muslim Brotherhood, JA036, JA038, an organization that the President has also recently designated as an FTO. Exec. Order No. 14,362, 90 Fed. Reg. 55033 (Nov. 28, 2025). Hamas's express goal is to destroy Israel and the Jewish people "from the [Jordan] River to the [Mediterranean] Sea." JA036, JA038. To accomplish this goal, Hamas engages in ongoing terrorist attacks against

Israel and a worldwide propaganda effort to demonize Israel as a "settler-colonial" oppressor of the Palestinian people. JA037, JA058–JA060. Hamas is largely funded, trained, and controlled by the Islamic Republic of Iran's Islamic Revolutionary Guard Corps ("IRGC"), which is itself a designated FTO. JA038. Hamas's intense propaganda effort also enables it to gain influence, sow hatred of Israel and Jews, and raise additional billions from sympathizers worldwide. JA038, JA058–JA060.

Defendants are three organizations—AJP Educational Foundation, Inc. a/k/a American Muslims for Palestine ("AMP"), National Students for Justice in Palestine ("NSJP"), and WESPAC Foundation—and four associated individuals—Hatem Bazian, Osama Abuirshaid, Taher Herzallah, and Zarefah Baroud. JA035–JA036, JA045–JA047, JA049–JA055, JA102.

For decades, Defendants' assistance to Hamas has taken many forms: overtly proclaiming support for, and that they are part of, the global intifada or "resistance" effort of Hamas; willingly disseminating Hamas propaganda, including materials straight from Hamas's own media office; glorifying Hamas's acts of terrorism; recruiting Hamas foot soldiers; encouraging acts of violence against Israel and against innocent

Jews around the world, including in America; and raising money for the benefit of Hamas. JA040–JA042, JA051–JA052, JA054–JA055, JA064, JA076–JA081, JA084–JA092, JA094–JA100, JA102.

Defendant AMP is the resurrected alter ego of the Islamic Association for Palestine ("IAP"), an entity that dissolved after being found civilly liable for providing material support to Hamas through its propaganda efforts. JA039–JA040, JA041–JA042, JA049, JA051–JA052. Defendant NSJP is the radical, violent campus arm of AMP in the United States, and Defendant WESPAC is a financial conduit, distributing money from AMP and NSJP. JA052–JA055, JA060–JA094, JA095–JA096. The individual defendants are senior leaders and employees of AMP who directed and participated in AMP's actionable conduct, materially facilitating the achievement of Hamas's terrorist mission. JA035–JA036, JA045–JA047, JA049–JA055, JA102.

After extensive planning and preparation, on October 7, 2023, Hamas invaded Israeli communities near Gaza and slaughtered over 1,200 innocents, including infants, children, entire families, and the elderly. They violently raped and tortured many more and took 251 hostages. It was the single largest massacre of Jews since the Holocaust.

Plaintiffs are U.S. and Israeli citizens who have been personally injured by the October 7 massacre. JA032–JA034. The seven Plaintiffs who are U.S. citizens (the "U.S. Plaintiffs") brought claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d), for aiding and abetting Hamas's acts of international terrorism. JA100-JA103. The two Plaintiffs who are Israeli citizens (the "Israeli Plaintiffs") brought claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for aiding and abetting Hamas's violations of international law. JA103-JA105. Both ATA and ATS claims are expressly predicated on Defendants' decades-long, systemic, knowing, and material assistance to Hamas that caused harm to Plaintiffs, of which October 7 is but one part. JA100–JA103, JA105.

## B.    Procedural Background

Plaintiffs filed their First Amended Complaint (the "Complaint") on July 9, 2024. JA029. As relevant here, Defendants moved to dismiss the ATS claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and the ATA claims under Rule 12(b)(6) for failure to state a claim.

The district court granted the Rule 12(b)(1) motion for the ATS claims, holding that it lacked subject matter jurisdiction because

"Plaintiffs failed to plead facts to overcome the presumption against extraterritorial application of the ATS." JA174. In doing so, the court held that "because Plaintiffs' injuries occurred on October 7, 2023, the Court must examine Plaintiffs' allegations regarding Defendants' conduct in the United States before the October 7, 2023 attack in Israel." JA180. It then held that Plaintiffs' pre-October 7 "allegations are very general and conclusory and do not specifically relate to the injuries complained of here." JA180. It concluded, "Plaintiffs do not allege that any planning, preparation, funding, or execution of the October 7, 2023 attack or any violations of international law by Hamas occurred in the United States." JA181. Therefore, the district court concluded that Plaintiffs had failed to draw a "sufficient connection" between Defendants' domestic activity and Hamas's October 7 attack. JA181. There was no "plausible inference that Defendants' 'public relations' activities aided and abetted Hamas in carrying out the specific October 7, 2023 attack (or subsequent or continuing Hamas violations) that caused the Israeli Plaintiffs' injuries, and thus [Plaintiffs] do not allege sufficient 'relevant' domestic conduct." JA182. The court further dismissed the relevance of Defendants' post-

October 7 domestic conduct, because it "could not have assisted the initial attack." JA182, JA185.

The district court granted the Rule 12(b)(6) motion for the ATA claims for the same reason it granted Rule 12(b)(1) dismissal of the ATS claims—namely, because it determined that ATA aiding-and-abetting liability "requires a connection between the alleged assistance and the *specific act of international terrorism that injured plaintiffs*[.]" JA189. It concluded that pursuant to the Supreme Court's decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), Plaintiffs "must plausibly allege that Defendants aided and abetted Hamas in carrying out [the October 7] attack" because they are "trying to hold Defendants liable for injuries stemming from [that] attack[.]" JA190.

The court concluded that the Complaint "fail[ed] to plead sufficient facts showing a 'definable nexus' between Defendants' conduct and Hamas's October 7, 2023 attack or subsequent international law violations" and "[e]ven assuming Plaintiffs have alleged an attenuated nexus," the Complaint did not "plausibly allege even prior knowledge of the October 7, 2023 attack, much less intentional aid that substantially furthered that tort." JA190. The district court further concluded that

"Plaintiffs' broad assertion that 'Defendants' support of Hamas has been so systemic that Defendants aid and abet every wrongful act committed by Hamas and its affiliates' does not overcome this [nexus] deficiency." JA190. It reasoned that, under *Taamneh*, "allegations of 'systemic' support do not circumvent the necessity to sufficiently allege 'defendants actually aided and abetted *each tort* of that enterprise.'" JA190. (quoting *Taamneh*, 598 U.S. at 506) (emphasis added).

## SUMMARY OF THE ARGUMENT

I.     The district court erred in dismissing the U.S. Plaintiffs' ATA claims for failure to state a claim under Rule 12(b)(6). The district court's demand of a strict nexus between Defendants' substantial assistance to Hamas and the October 7 massacre was legal error. Plaintiff's ATA claim is not about October 7 *simpliciter*; it is about Defendants systemically aiding Hamas, such that they must be held liable for all acts of Hamas, including October 7. JA042, JA055, JA064–JA076, JA077, JA099, JA100–JA102, JA105. *Taamneh* declared that ATA aiding-and-abetting liability "*does not always demand a strict nexus* between the alleged assistance and the terrorist act." 598 U.S. at 497 (emphasis added). Here, unlike in *Taamneh*, Plaintiffs allege—repeatedly—that the Defendants

provided pervasive, systemic, and culpable assistance to, and consciously and selectively chose to promote content provided by, Hamas. *See, e.g.*, JA033, JA035, JA055, JA076−081, JA099, JA100−JA102. Plaintiffs' Complaint provided extensive facts—which at this stage must be accepted as true and all reasonable inferences therefrom drawn in Plaintiffs' favor—showing a deep, longstanding, and knowing relationship between Defendants and Hamas. As in *Halberstam*, Defendants knowingly gave their talents and time to aid Hamas's terrorist mission, providing decades-long assistance in the form of propaganda dissemination, recruitment of Hamas supporters, and financial assistance. Their support was no passing fancy or impetuous act. They knew—as we all know—that Hamas is a terrorist organization dedicated to murdering Jews and destroying Israel (and supporters thereof). Knowingly providing support to a known terrorist organization with a mission to kill Jews creates a foreseeable risk that Jews will be killed by it. The Complaint's extensive factual allegations documenting the relationship between Defendants and Hamas, both before and after October 7, create a reasonable inference that Defendants knowingly and willingly participated in Hamas's terrorist enterprise.

II. The district court likewise erred in dismissing the Israeli Plaintiffs' ATS claims for lack of subject matter jurisdiction. The district court focused solely on the location of the Israeli Plaintiffs' injuries rather than location of the "relevant conduct" that constitutes Defendants' aiding and abetting, as required by the Supreme Court's and this Court's precedents. The "relevant conduct" here was entirely domestic. All Defendants, both institutional and individual, are domestic. Their acts of aiding and abetting Hamas occurred in the United States. In addition, the district court applied the incorrect standard for aiding and abetting liability under international law, again leading it to focus solely on Israeli Plaintiffs' injuries arising from October 7 rather than Defendants' full course of domestic conduct that Plaintiffs properly pled constitutes aiding and abetting under international law. And finally, the district court refused to treat Plaintiffs' injuries as ongoing, freezing Plaintiffs' injuries in time to those that occurred on October 7 and constraining the court's analysis to the detriment of Plaintiffs' well-pleaded allegations of ongoing harm.

For those reasons, the Court should reverse the decision of the district court and reinstate Plaintiffs' ATA and ATS claims.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal for both lack of extraterritorial jurisdiction under Rule 12(b)(1), *see United States v. Ojedokun*, 16 F.4th 1091, 1101 (4th Cir. 2021), and for failure to state a claim under Rule 12(b)(6). *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023). Moreover, because the ATA claims were dismissed under 12(b)(6), this Court must assume the truth of all factual allegations in the Complaint and draw all reasonable inferences from those allegations in Plaintiffs' favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011*)*.

## ARGUMENT

I.    **The district court erred in dismissing the U.S. Plaintiffs' ATA claims for failure to state a claim under Rule 12(b)(6)**

The district court erred in dismissing the U.S. Plaintiffs' claims for aiding and abetting acts of international terrorism under the ATA. Although an aiding-and-abetting claim has multiple elements, the district court correctly observed that there is no dispute that Hamas is a designated FTO or that it committed an act of international terrorism on October 7, 2023 that resulted in harm to Plaintiffs. The only legal

question, therefore, is whether the Complaint plausibly alleges that Defendants "knowingly" provided "substantial assistance" to Hamas and its acts of terrorism.

The Complaint sufficiently alleges this element. As elaborated below, the Complaint alleges in detail that Defendants have well-documented, longstanding, and close associations with Hamas and its operatives and have knowingly provided support to Hamas for more than a decade by disseminating Hamas propaganda, praising its terrorist acts (including, but not limited to, October 7), recruiting Hamas foot soldiers on campuses and elsewhere the United States, and raising money for the benefit of Hamas, all of which is intended to bring about the success of Hamas's terrorist mission worldwide. Defendants overtly proclaim to be part of the Hamas "Unity Intifada" and its "resistance" to Israel, Jews, and supporters thereof. JA033, JA047, JA062, JA063, JA066–JA076, JA083, JA098, JA101. They expressly advocate using "any means necessary" to engage in such resistance and celebrated when the October 7 massacre occurred, calling it a "heroic," "brave," and "noble" part of a broader "diaspora" to bring about a "Palestinian revolution" to "br[ing] the war home" to the U.S. JA089–JA090, JA090–JA091. Hamas's key

global ally, Iran, has overtly praised Defendant NSJP and described it as a "branch of the Resistance Front." *Id.* JA092. Hamas itself, Hezbollah, and the Popular Front for the Liberation of Palestine ("PFLP") have likewise praised NSJP's assistance to Hamas's cause. JA 033, JA038, JA059, JA092, JA094, JA098; *see also* JA131 (social media post of Grand Ayatollah Khamenei praising the NSJP-led "Resistance Front").

Tellingly, Defendants did not condemn the October 7 mssacre or disavow any relationship with Hamas thereafter To the contrary, they immediately celebrated the massacre, producing and disseminating elaborate propaganda materials that employed professional-level crisis management tactics to minimize the brutal nature of Hamas's atrocities, help recruit additional pro-Hamas loyalists, and raise money in further support of Hamas's terrorist mission. JA033, JA060−JA063, JA066−JA076, JA083, JA089, JA090, JA092, JA093, JA094, JA098, JA101; *see also* JA108 (AMP/NSJP "Day of Resistance Toolkit"), JA114 (Towfan Al-Aqsa Statement by Bears for Palestine). Indeed, Defendants refer to October 7 as a "historic win for the Palestinian resistance," of which they proclaim to be a part, and "a heightened stage of the

Palestinian struggle" that is only part of a "prolonged war for liberation," and "a natural and justified response. JA108.

Defendants' production and dissemination of the NSJP Toolkit and Towfan Al-Aqsa Statement *immediately* after the massacre create a reasonable inference that Defendants had prior knowledge of the October 7 attack, contrary to the district court's conclusion. JA185. More fundamentally, although post-crime acts might not always establish aiding and abetting on their own, they do provide relevant circumstantial evidence of aiding and abetting because they can demonstrate prior knowledge, intent, or participation in the crime. *See, e.g.*, *United States v. Hurley*, 755 F.2d 788, 789−90 (11th Cir. 1985); *Davis v. Lafler*, 658 F.3d 525, 531−34 (6th Cir. 2011); *Iowa v. Burton*, 24 N.W.3d 771 (Table), 2025 WL 1822514 at *4 n.5 (Iowa Ct. App. 2025); *Oregon v. Holcomb*, 268 P.3d 684, 694−696 (Or. Ct. App. 2011); *People v. Campbell*, 30 Cal. Rptr.2d 525, 530 (Cal. Ct. App. 1994); *Missouri v. McGowan*, 789 S.W.2d 242, 243. (Mo. Ct. App. 1990); *Illinois v. Holloway*, 475 N.E.2d 915, 932 (Ill. Ct. App. 1985). Here, Defendants' *post*-October 7 acts, combined with the Complaint's extensive facts detailing a deep, longstanding, *pre*-October 7 relationship with Hamas, create a reasonable inference that Defendants

were knowing and material participants not only in the October 7 massacre itself, but in Hamas's terrorist enterprise generally, both before and after, including Hamas's continued acts of terror flowing from October 7. Assuming the truth of all of Plaintiffs' factual allegations and drawing all reasonable inferences from them in Plaintiffs' favor, the 12(b)(6) motion as to Plaintiffs' ATA claims should have been denied.

A.    **The district court incorrectly interpreted *Taamneh* as requiring a strict nexus to establish aiding-and-abetting liability under the ATA**

The district court's demand of a strict nexus between Defendants' substantial assistance to Hamas and the October 7 massacre was clear legal error resting on a flawed reading of *Taamneh*. Contrary to the opinion below, *Taamneh* articulates three principles that squarely support liability in this case. *First*, *Taamneh* declared that ATA aiding-and-abetting liability "*does not always demand a strict nexus* between the alleged assistance and the terrorist act." 598 U.S. at 497 (emphasis added). Second, *Taamneh* recognized that, under the "near-common enterprise" theory, *id.* at 502, "a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *Id.* at 497.

15

And third, *Taamneh* noted that, although the claims before the Supreme Court did not succeed, liability might well lie if a defendant "consciously and selectively chose to promote content provided by a particular terrorist group." *Id.* at 502. Although the district court paid lip service to some of these principles, its cramped application of *Taamneh* resulted in reversible error.

*Taamneh* held that an ATA aiding-and-abetting claim did not lie against three large social media companies (Facebook, Twitter and Google), based on a 2017 attack on a nightclub in Istanbul, Turkey for which ISIS claimed credit. *Id.* at 478. The basis for the ATA claim was that the social media companies failed to do enough to remove ISIS users and content from their websites. *Id.* The Court held that "terms like 'aids and abets' are familiar to the common law" and the court must "presume that such common law terms 'bring the old soil' with them." *Id.* at 484 (quoting *Sekhar v. United States*, 570 U.S. 729, 733 (2013)) (cleaned up). In reaching its conclusion, the Court looked to the legislative history of the ATA's aiding-and-abetting provision.

Congress enacted the aiding-and-abetting language in 18 U.S.C. § 2333(d)(2), as part of the 2016 Justice Against Sponsors of Terrorism

Act ("JASTA"). Congress intended JASTA "to provide civil litigants with *the broadest possible basis . . .* to seek relief." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (citation omitted). In so doing, it expressly endorsed the "legal framework" used by the D.C. Circuit in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Taamneh*, 598 U.S. at 485. The *Taamneh* Court "thus beg[a]n with *Halberstam*'s 'legal framework, viewed in context of the common law tradition from which it arose." *Id.*

*Halberstam*'s "extensive survey of the common law" identified three core elements for aiding-and-abetting liability: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury"; (2) the defendant "must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance"; and (3) the defendant "must knowingly and substantially assist the principal violation." *Id.* at 486 (quoting *Halberstam*, 705 F.2d at 477). *Halberstam* further articulated six factors that help determine whether a defendant's assistance was "substantial" under the third element.[1] Thus, in

---

[1] Those six factors are: (1) the "nature of the act assisted"; the "amount of assistance" provided; (3) whether defendant was "present at the time" the principal tort was committed; (4) the defendant's "relation to the

determining aiding-and-abetting liability under Section 2333(d), the court's lodestar must be "the common law of aiding and abetting upon which *Halberstam* rested and to which JASTA's common-law terminology points." *Id.* "At bottom, both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed." *Id.* at 493 (cleaned up). Moreover, Section 2333(d)(2)'s "twin requirements"—knowing and substantial assistance—"work[] in tandem, with a lesser showing of one demanding a greater showing of the other." *Id.* at 491−92. The interplay between scienter and substantial assistance is a spectrum, and "less substantial assistance require[s] more scienter." *Id.* at 492.

Importantly, *Taamneh* held that the social media defendants "*overstate[d]* the nexus that § 2333(d)(2) requires between the alleged assistance and the wrongful act." *Id.* at 495 (emphasis added). The

_____

tortious actor"; (5) the defendant's state of mind; and (6) the "duration of the assistance" provided. *Taamneh*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 488). These six factors are discussed extensively in Section I.C.

18

statute's text "*does not always demand a strict nexus* between the alleged assistance and the terrorist act." *Id*. at 497 (emphasis added). This is because, in part, "aiding and abetting does not require the defendant to have known 'all particulars of the primary actor's plan.'" *Id*. at 495 (quoting Restatement (Third) of Torts: Intentional Torts to Persons § 10, cmt. *c*, p. 104 (Tent. Draft No. 3, Apr. 6, 2018)). Instead, when a defendant intends to aid in the commission of a tort, he is liable for any foreseeable risks flowing therefrom. *Id*. at 496.

Accordingly, the Supreme Court specifically rejected the social media defendants' contention that ATA aiding-and-abetting liability required evidence that defendants "directly aided and abetted *the [ ] nightclub attack* with a strict nexus between [defendants'] assistance and *that attack*" that injured plaintiffs. *Id*. at 494 (emphases added). Instead, to survive a 12(b)(6) motion, *Taamneh* held that a plaintiff asserting an ATA aiding-and-abetting claim must allege plausible facts satisfying *Halberstam*'s three elements. First, a plaintiff "must plausibly allege that defendants aided and abetted" a terrorist attack that harmed them. *Id*. at 497. Second, a plaintiff must allege that the defendants were generally aware of their role as part of an overall illegal or tortious activity, which

is satisfied by plausibly alleging that "defendants knew they were playing some sort of role in [a terrorist] enterprise." *Id.* Third, the complaint must plausibly assert that defendant's assistance in the illegal or tortious activity was knowing and substantial. *Id.*

This third *Halberstam* element—knowing and substantial assistance—"does not require the defendant to have known all particulars of the primary actor's plan." *Id.* at 495 (internal quotation marks omitted). Although it is "not enough" to allege that defendants provided substantial assistance to a "transcendent 'enterprise' separate and floating above all the actionable wrongs that constitute it," it *is enough* if plaintiff plausibly alleges that the defendant provided knowing and substantial assistance "in the commission of the actionable wrong— here, an act of international terrorism." *Id.*

This does not mean, as the district court insisted, that there must be a "definable nexus" between defendant's assistance and the act of terrorism. JA190. *Taamneh* declared that "a close nexus between the assistance and the tort *might help* establish" aiding-and-abetting liability, "but *even more remote support can still constitute aiding and abetting* in the right case." 598 U.S. at 496 (emphasis added). The

*Taamneh* Court agreed that "in appropriate circumstances, a secondary defendant's role in an illicit enterprise can be *so systemic* that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise—as in *Halberstam* itself." *Id*. When this happens, "aiding-and-abetting liability begins to blur with conspiracy liability," with the chief difference being that aiding-and-abetting liability is not dependent on the existence of an "agreement" among the defendant and tortfeasor. *Id*.

Applying these principles in *Taamneh* yielded clear and unanimous results. Plaintiffs there alleged that the social media defendants aided and abetted ISIS by "knowingly allowing ISIS and its supporters to use their platforms and benefit from their 'recommendation' algorithms, enabling ISIS to connect with the broader public, fundraise, and radicalize new recruits." *Id*. at 481−82. Plaintiffs further alleged that the social media defendants profited from advertisements placed on ISIS tweets, posts, and videos and that one platform, Google, even shared ad revenue with ISIS. *Id*. at 482.

These allegations were insufficient to state a claim for ATA aiding-and-abetting, as the "fundamental question" for such claims is this: "Did

defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?" *Id.* at 505. The *Taamneh* plaintiffs "never allege[d] that ISIS used defendants' platforms to plan or coordinate the [nightclub] attack; in fact, they d[id] no allege that the [terrorist] himself ever used Facebook, YouTube, or Twitter." *Id.* at 498. Indeed, "the only affirmative 'conduct' defendants allegedly undertook was creating their platforms and setting up their algorithms to display content relevant to user inputs and user history." *Id.* There was no allegation that the social media defendants "gave ISIS any special treatment or words of encouragement." *Id.* There was no plausible allegation that the social media defendants even "carefully screened any content" before allowing users like ISIS to upload it and "[i]f anything, the opposite is true: By plaintiffs' own allegations, these platforms appear to transmit most content without inspecting it." *Id.* at 498–99.

Merely operating a social media platform used by bad actors, in other words, is not aiding and abetting their bad acts, any more than providing cell phone or email service would be. *Id.* at 499. "At bottom," the *Taamneh* Court concluded, plaintiffs' allegations rested on "an alleged failure to stop ISIS from using those platforms" but under the

common law, aiding-and-abetting liability cannot attach for "mere passive nonfeasance." *Id.* at 500. The complaint, however, "essentially portray[ed] defendants as bystanders, watching passively as ISIS carried out its nefarious schemes." *Id.*

*Taamneh* thus refused to impose ATA aiding-and-abetting liability where a defendant provides routine business services in an ordinary, arms-length business transaction. Imposing liability under such circumstances, the Court observed, would expose routine service providers to liability for "each and every ISIS terrorist act committed anywhere in the world." *Id.* at 501. While enterprise liability is permissible under Section 2333(d), plaintiffs' allegations "f[e]ll short" of that because "Plaintiffs *do not claim that defendants intentionally associated themselves with ISIS' operations* or affirmatively gave aid that would assist each of ISIS' terrorist attacks." *Id.* at 502 (emphasis added). They did not "allege[] that defendants and ISIS formed a near-common enterprise of the kind that could establish such broad liability," which must be based on "*pervasive, systemic, and culpable* assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." *Id.* (emphasis added).

*Taamneh* refused, however, to "rule out the possibility" that "some set of allegations involving a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts." *Id*. If an entity "*consciously and selectively chose to promote content provided by a particular terrorist group*," the Court observed, "perhaps it could be said to have culpably assisted the terrorist group." *Id*. (emphasis added). In these situations, the *Taamneh* Court observed, "the defendants would arguably have offered aid that is more direct, active, and substantial than what we review here" and a plaintiff in such case "might be able to establish liability through a lesser showing of scienter." *Id*. As elaborated below, Plaintiffs here sufficiently pled that Defendants' activities were more "direct, active, and substantial" than the social media companies' activities in *Taamneh*.

### B. Plaintiffs adequately allege knowing and substantial assistance to Hamas

The Complaint sufficiently alleges facts supporting liability under the near-common enterprise theory. Here, unlike *Taamneh*, Plaintiffs repeatedly allege that the Defendants knowingly provided pervasive, substantial, systemic, and culpable assistance to Hamas. *See, e.g.*, JA033,

JA042, JA055, JA076-JA081, JA099, JA100-JA101, JA101-JA102. The Complaint provides detailed factual allegations regarding the extensive relationship each Defendant has with Hamas—both before and after the October 7 massacre—and the nature of its aid thereto. Taking these allegations as true and drawing all reasonable inferences therefrom in Plaintiffs' favor, Plaintiffs plausibly allege that Defendants knowingly provide "pervasive and systemic aid" to Hamas such that they "actually aided and abetted each tort of that enterprise." *Taamneh*, 598 U.S. at 506.

The district court below correctly noted that two of the three required elements of an ATA aiding-and-abetting claim—i.e., that a terrorist organization (Hamas) committed an act of terror that caused Plaintiffs injury—were not in dispute. JA187. The "primary question," therefore, was "whether Defendants' conduct constitutes 'aid[ing] and abet[ting], by *knowingly providing substantial assistance*' to Hamas[.]" JA190 (emphasis added). On that issue, as elaborated above, the district court concluded that "Plaintiffs fail to plead sufficient facts showing a '*definable nexus*' between Defendants' conduct and Hamas's October 7, 2023 attack[.]" JA190 (emphasis added). The lack of a specific nexus to

the October 7 massacre, explained the court, also gutted Plaintiffs'
allegation of *systemic aid* to Hamas: "Plaintiffs' broad assertion that
'Defendants' support has been so systematic that Defendants aid and
abet every wrongful act committed by Hamas and its affiliates' does not
overcome this [nexus] deficiency." *Id*. at 23.

This was legal error. Plaintiffs' ATA aiding-and-abetting claim is
not only about October 7 *simpliciter*; it is about Defendants' *systemic aid*
to Hamas, such that they must be held liable for all of Hamas's acts,
including, but not limited to, the October 7 massacre and the ongoing acts
of terror flowing therefrom. As the Complaint clearly states, "This case is
about organizations whose very creation was intended to provide
continuous, systematic, and substantial assistance to an FTO [Hamas]."
JA099 (emphasis added). The Complaint repeatedly states that
Defendants' aid to Hamas is so deep and systemic that they are liable for
all of Hamas's terrorist acts. JA033, JA042, JA055, JA064, JA076,
JA077, JA099, JA100, JA101, JA102, JA105. In support of this claim, the
Complaint provides extensive facts detailing the deep, longstanding
relationship between Hamas and each Defendant, elaborating the
specific means by which each Defendant knowingly provided material

support to Hamas via propaganda, recruiting, and fundraising. *See, e.g.*, JA049-JA052, JA0076, JA081, JA090, JA094-JA097, JA098-JA099 (Defendant AMP); JA052-JA053, JA097, JA098, JA099 (Defendant WESPAC); JA054, JA060-JA064, JA065-JA076, JA076-JA077, JA081, JA081-JA092, JA095-JA097, JA097-JA098 (Defendant NSJP); JA055, JA064-JA065 (all Defendants). The district court was obligated not only to accept the truth of all these factual allegations in the Complaint, but also to draw all reasonable inferences from them in Plaintiffs' favor. *E.I. du Pont*, 637 F.3d at 440. If the district court had done so, it would have easily denied the 12(b)(6) motion.

Regarding Defendant AJP Educational Foundation, Inc.—also known as American Muslims for Palestine, or "AMP"—the Complaint sets forth elaborate, plausible facts discussing how AMP is Hamas's propaganda division in the United States, serving as the "alter ego" successor organization to the Islamic Association for Palestine ("IAP"). JA032, JA035, JA039-JA049, JA051-JA052, JA055, JA076, JA077, JA094-JA099. The Complaint explains how, in *Boim v. American Muslims for Palestine*, the plaintiffs successfully alleged that AMP was an alter ego of IAP and sufficiently stated a viable ATA aiding-and-

abetting claim against AMP. No. 17-C-3591, 2022 U.S. Dist. LEXIS 88508 (N.D. Ill. May 17, 2022); *see also*, JA035, JA040. The *Boim* plaintiffs alleged—as do Plaintiffs here[2]—that AMP was the alter ego of IAP, which dissolved after being found liable under the ATA, resulting in a $156 million judgment. *Id*. at 549. The *Boim* complaint alleged that IAP and AMP "raise[d] money, spread the organization's message, advance[d] the organization's pro-Hamas/anti-Israel political objectives, provide[d] a fundraising platform for pro-Hamas intermediary organizations, and . . . provide[d] indirect support for Hamas itself." *Boim*, 2022 U.S. Dist. LEXIS 88508, at *4. Plaintiffs' Complaint here contains the same extensive allegations against AMP. *See, e.g*., JA035, JA040, JA041-JA042, JA049, JA051-JA052, JA055, JA059, JA060, JA062, JA064, JA076, JA077, JA081, JA090, JA091, JA095-JA096, JA096-JA099, JA101, JA102; *see also* JA135 (House Oversight Comm. Letter).

The Complaint further details how AMP unabashedly proclaims to be "part of" Hamas's "Unity Intifada" seeking to "globalize" the Intifada, and how it is governed by Hamas's "unified command" in Gaza. JA033,

---

[2] JA035, JA038-JA052, JA095-JA096, JA097; JA135 (House Oversight Comm. Letter).

JA047, JA062, JA063, JA066-JA076, JA083, JA098, JA101; *see also* JA108. The Complaint describes how AMP's activities are aimed at normalizing Hamas's "Intifada" and recruiting Hamas foot soldiers to engage in "resistance" to Jews and Israel (and Western support thereof) "by any means necessary," including acts of terrorism. JA032-JA033, JA041, JA049, JA054-JA055, JA059-JA060, JA060-JA062, JA064-JA065, JA081, JA088, JA095-JA096, JA098, JA099, JA101, JA102; *see also* JA108 (House Oversight Comm. Letter). It also explains how AMP raises money for the benefit of Hamas. JA035, JA040, JA041-JA042, JA49, JA094, JA095, JA101; *see also* JA135 (House Oversight Comm. Letter).

Assuming these allegations as true and drawing all reasonable inferences therefrom in Plaintiffs' favor, the Complaint more than adequately states a claim that Defendant AMP has for years engaged in systemic, knowing, and substantial assistance to Hamas. The 12(b)(6) motion as to it should have been denied, as it was in *Boim*. *See Boim*, 2022 U.S. Dist. LEXIS 88508, at *1–2.

Regarding Defendant NSJP, the Complaint provides facts demonstrating that it acts as the campus mouthpiece for AMP, spreading

Hamas propaganda and recruiting pro-Hamas foot soldiers via hundreds of university chapters of Students for Justice in Palestine ("SJP"). JA032-JA033, JA035, JA049, JA054, JA055, JA060-JA094. NSJP holds conferences and workshops disseminating Hamas propaganda and recruiting members of the "resistance" to Jews, Israel and supporters thereof. JA049, JA054, JA058, JA059, JA088-092. Speakers at NSJP's May 2024 conference glorified the October 7 massacre as part of a "heroic," "brave," and "noble" global "diaspora" movement aimed at achieving a "Palestinian revolution" to "br[ing] the war home" to the United States—a war that attendees were "committed" to fighting. JA089-JA090, JA090-JA091. While the conference was ongoing, the Supreme Leader of Iran, Grand Ayatollah Ali Khamenei—a known supporter and ally of Hamas—published a letter praising Defendant NSJP and declaring unity with it as a "branch of the Resistance Front," engaged in the "same struggle *for many years* in a place far from you." JA092 (emphasis added). Indeed, as the Complaint alleges, Hamas, Iran, Hezbollah, and the PFLP have all issued overt statements supporting NSJP, with Iran overtly declaring NSJP a "branch of" its terrorist network with Hamas. JA033, JA0385, JA059, JA092, JA094, JA098; *see*

*also* JA131 (social media post of Grand Ayatollah Khamenei praising the NSJP-led "Resistance Front").

The Complaint further alleges that NSJP engages in an active and sophisticated social media campaign to further AMP's and Hamas's propaganda and recruitment effort. JA049, JA060, JA066, JA086; *see also* JA108. NSJP has repeatedly identified itself as part of Hamas and extensively cooperates with Hamas by disseminating its instructions and propaganda, and hosting events with Hamas-affiliated speakers from designated terrorist organizations such as Samidoun and the PFLP, during which they discuss how their actions are helping Hamas. JA054, JA055, JA059-JA060, JA076-JA077, JA089, JA093. NSJP overtly calls for—and its members have engaged in—violent attacks against Jews. JA054, JA062, JA063, JA064-JA066, JA100. The Islamic Republic of Iran has expressly declared NSJP a "branch of" Hamas. JA054; *see also* JA080-JA081 (documenting relationship between Hamas, IRGC and Defendants).

The Complaint also alleges numerous facts creating a reasonable inference of coordination between Hamas and all Defendants. For example, the Complaint provides specific examples of how Hamas itself

"has regularly adopted Defendants' propaganda language and framing."
JA076. It likewise details how Defendants, in return, "answer the calls
from Hamas" for specific actions, after which Hamas overtly expresses
its appreciation. JA077. It conveys how Defendants are equally
responsive to "Hamas's puppet masters, the IRGC," providing the
example of how a few months after the October 7 massacre, the IRGC
called for an "economic blockage across four continents in solidarity with
Palestinians" to take place on April 15, 2024. JA080. Metadata confirms
that Defendants purchased websites dedicated to organizing and
supporting this terrorist blockade and began planning their
"Strike4Gaza" *weeks before* the IRGC's call became public, and on April
15, 2024—as requested by IRGC—AMP and SJP chapters across the U.S.
created an economic blockade that disrupted economic hubs such as the
Golden Gate Bridge, Brooklyn Bridge, New York Stock Exchange, and
the Chicago-O'Hare airport. JA080-JA081.

Moreover, on the day of the October 7 massacre, Hamas issued a
"call for mass mobilization" to support its terrorist mission, as it often
does to its affiliates. JA061, JA079. The *very next day*, on October 8, 2023,
NSJP disseminated the "NSJP Toolkit," which expressly identifies NSJP

(and Defendant AMP) as "PART of" a "Unity Intifada" governed by Hamas's "unified command" in Gaza. JA033, JA060-JA061, JA062, JA063, JA076, JA083, JA098, JA101; *see also* JA108. The Toolkit was disseminated in over 300 U.S. college campuses and on social media. JA061.

In the Toolkit, AMP and NSJP express their support of Hamas's global Intifada against Israel and Jews, seeking Palestinian "liberation" by "any means necessary," including "armed struggle" and any other acts of violence, specifying that all means of "resistance" is "necessary." JA061-JA062. The Toolkit was distributed in preparation for a "national day of resistance" in support of Hamas's "resistance" to Israel, Jews and their "Zionist" supporters, and it described the October 7 massacre as "a historic win for the Palestinian resistance" of which Defendants repeatedly and overtly proclaim to be a part. JA061, JA066, JA086, JA089, JA090, JA092, JA093, JA094; *see also* JA108 (AMP/NSJP "Day of *Resistance* Toolkit") (emphasis added). It declared that Defendants "have an unshakable responsibility to join the call for mass mobilization" for its members to "struggle alongside our people back home [in Gaza] . . . and above all normalize and support our fearless resistance" to Israel, Jews,

and Zionists and achieve "[l]iberation" for Palestinians "by any means necessary," including "armed struggle, general strikes, and popular demonstrations. All of it is legitimate, and all of it is necessary." JA061-JA062. The Toolkit urged waging a "Unity Intifada" and "revolution" with the "resistance fighters" of Hamas, which requires "unifying our people in the name of resistance" under a "unified command." JA062. It provided "graphics and advertisements" for SJP Chapters to use, including despicable "images of paragliders, which references how Hamas infiltrated the Nova [Music] Festival" during the October 7 massacre. JA062; *see also* JA108 (graphics templates). It endorsed and urged all SJP chapters to sign the "Towfan Al-Aqsa Statement" penned by the University of California at Berkeley chapter—and signed by approximately 25 additional SJP chapters—*on October 7, 2023*, the same day of the massacre, which proclaimed support for Hamas's brutal and terroristic slaughter of more than 1,200 Jews and taking of over 250 hostages that day. JA063; *see also* JA108, JA114 (Towfan Al-Aqsa Statement by Bears for Palestine). The statement expressed "unwavering support of the resistance in Gaza" and endorsed "Towfan Al-Aqsa"—the label Hamas gave to its October 7 massacre—as "the Second Intifada"

and "a revolutionary moment in contemporary Palestinian resistance." JA114. The NSJP chapters "honor[ed]" the Hamas terrorists, calling them "comrades in blood and arms[.]. JA063, JA114.

The dissemination of the Toolkit and Towfan Al-Aqsa Statement immediately after the launch of the October 7 massacre—indeed, while the massacre was still ongoing—creates a reasonable inference that Defendants had prior knowledge of the October 7 attack, contrary to the district court's conclusion. JA185. More fundamentally, Defendants post-October 7 acts provide relevant circumstantial evidence of aiding and abetting. It is well settled that, although a defendant's post-crime acts might not always establish aiding and abetting on their own, they nonetheless provide relevant, circumstantial evidence of aiding and abetting because they can demonstrate prior knowledge, intent, or participation in the crime. *See, e.g.*, *Hurley*, 755 F.2d at 789−90; *Davis*, 658 F.3d at 531−34; *Holcomb*, 268 P.3d at 694−96; *Burton*, 24 N.W.3d 771 (Table), 2025 WL 1822514 at *4 n.5; *Campbell*, 30 Cal. Rptr.2d at 530; *McGowan*, 789 S.W.2d at 243; *Holloway*, 475 N.E.2d at 932.

The Defendants' *post*-October 7 acts, *combined with* the Complaint's extensive facts detailing a deep, longstanding, *pre*-October 7

relationship with Hamas, create a reasonable inference that Defendants were knowing and material participants not only in the October 7 massacre itself, but in Hamas's terrorist enterprise generally. As such, the 12(b)(6) motion as to Plaintiffs' ATA claims should have been denied.

The district court likewise refused to draw a reasonable inference that Defendant WESPAC provided systemic, knowing and material support to Hamas, despite the Complaint's numerous factual allegations elaborating WESPAC's essential role in "collecting donations" for Hamas. JA055. For example, the Complaint alleges that WESPAC funds both Defendants AMP and NSJP. JA033, JA035, JA052-JA053, JA054, JA055, JA064, JA076, JA098, JA099, JA101, JA102. It alleges that WESPAC funded the NSJP "Toolkit," distributed the day after the October 7 massacre, which advocates violent "resistance" to Israel and the United States and expressly proclaims that Defendants AMP and NSJP are part of the "Unity Intifada" governed by Hamas. JA033, JA064. It further alleges that WESPAC "receives and administers donations on behalf of NSJP" and in return, "keeps a percentage of the donations and remits the rest" to anti-Israel, pro-Hamas groups. JA052. By doing this, WESPAC "enables NSJP to collect and distribute funds without

transparency" so that the "public [cannot] view the flow of funds" between NSJP and these third-party anti-Israel, pro-Hamas groups. JA052. The Complaint further reveals that WESPAC's financial data reported to the IRS infers an intent to serve as a financial conduit to obscure NSJP's true funding sources as well as to whom its fundraising monies are distributed. For example, it alleges that in 2022, WESPAC reported $2.4 million in revenue, spending an astonishing $1.5 million of this revenue—62.5 percent—on "office expenses." JA052. At the same time, WESPAC strangely reported *zero* fundraising expenses, travel, IT, legal services, insurance, rent, mortgage payments, or even executive or board salaries. JA053. Indeed, WESPAC reported the salary of only one, part-time employee in the entire organization—a digital media coordinator whose salary was less than $100,000 and did not receive any employer benefits. JA053. Given these facts, it is reasonable to infer, as the Complaint alleges, that WESPAC is receiving tax-exempt donations on behalf of NSJP (since NSJP is itself not tax-exempt), and then controlling how those donations are spent, obscuring both the source and recipients of those funds. JA053. By operating in this opaque manner, WESPAC

knowingly hides AMP and NSJP's financial support to Hamas and its affiliates. JA055.

The Complaint also reveals that the U.S. House Committees on Oversight and Education have an ongoing investigation into WESPAC's (as well as Defendants AMP's and NSJP's) financial ties to Hamas, requesting all Suspicious Activity Reports flagged by the U.S. Department of Treasury for these organizations. JA097, JA140. The request notes that the Committees are "investigating the sources of funding and financing for groups who are organizing, leading, and participating in pro-Hamas, antisemitic, anti-Israel, and anti-American protests with illegal encampments on American college campuses." JA140. These facts create a reasonable inference that WESPAC provides systemic, knowing, and substantial assistance to Hamas.

Finally, the Complaint documents the long-term, deep, and systematic relationship between Hamas and individual Defendants Bazian, Abuirshaid, Herzallah, and Baroud. *See, e.g.*, JA035-JA036, JA042, JA045-JA046, JA047, JA049, JA50, JAJA055, JA102. Each of these individuals serve in important roles for Defendants AMP and NSJP

and in those roles, they directly participate in the propaganda, recruiting, and financial support of Hamas. JA032, JA049.

Defendant Bazian is the founder of both AMP and NSJP and currently serves as Chair of AMP's national board. JA035, JA0385, JA047; *see also* JA135 (House Oversight Comm. Letter). He overtly supports terrorists who have murdered Jews and calls for the elimination of Israel and intifada in the United States. JA047. In his capacity as the founder and leader of AMP and NSJP, he has been directly involved in those organizations' longstanding, material assistance to Hamas via fundraising, propaganda, and recruitment. JA055, JA102.

Defendant Abuirshaid is AMP's Executive Director and a member of its Board. JA032, JA035, JA042, JA045; *see also* JA135 (House Oversight Comm. Letter). He previously served on the board of IAP, which was founded and controlled by Hamas senior leaders and served to fundraise and provide propaganda for Hamas. JA039-JA040. IAP was found civilly liable for providing material support to Hamas in 2004 and shut down.      JA040, JA041. Defendant Abuirshaid specializes in promoting Hamas propaganda, speaking at events and appearing in

media outlets to promote its anti-Israel, antisemitic terrorist goals. JA045-JA046, JA049, JA055, JA102.

Defendant Herzallah is the Director of Outreach and Grassroots Organizing for Defendant AMP and serves as the liaison between AMP and NSJP, overseeing those Defendants' distribution of Hamas propaganda and recruitment information via social media. JA049, JA102.

Defendant Baroud is the Media and Communications Coordinator for Defendant AMP, who oversees both AMP's and NSJP's social media which spews Hamas propaganda and recruitment information and produces other Hamas propaganda for distribution by NSJP chapters throughout the country. JA036, JA045, JA049, JA102. Her father is the editor-in-chief of a U.S.-based newspaper with ties to Hamas that spews Hamas propaganda. JA036. These facts—together with the facts relating to Defendants AMP and NSJP—create a reasonable inference that the individual Defendants provide systemic, knowing, and substantial assistance to Hamas.

### C. *Halberstam* confirms that Plaintiffs have stated a claim for ATA aiding-and-abetting liability

Comparing the facts here to those in *Halberstam* shows that Plaintiffs' Complaint is more than sufficient to state a claim for ATA aiding-and-abetting. This is especially true because the D.C. Circuit's opinion in *Halberstam* followed a bench trial on the merits, whereas this case is at the pre-discovery, motion-to-dismiss stage, during which all factual allegations in the Complaint must be taken as true and all reasonable inferences therefrom drawn in Plaintiffs' favor.

Start with the facts in *Halberstam*. There, the district court concluded that the defendant, Linda Hamilton, was a knowing and substantial participant in the ongoing criminal enterprise of her live-in boyfriend, who committed a series of burglaries in the Washington, D.C. area during their five-year relationship. *Halberstam*, 705 F.2d at 474−76. Hamilton did not accompany her boyfriend during these burglaries and disclaimed any knowledge thereof, but she knew he had coins, jewelry, and antiques that he claimed were bought at estate sales and as investments. *Id.* at 475. She admitted that he had no outside employment, yet he left the house four or five times each week at around 5:00 p.m., returning around 9:00 p.m. with antiques, jewelry, and

precious metals. *Id*. She was also aware that her boyfriend bought a smelting furnace that he used to melt gold and silver items into ingots that were then sold to third-party refiners. *Id*. She handled the paperwork for these ingot sales, kept inventories of other antiques sold, and undertook general secretarial and bookkeeping tasks for her boyfriend's "business." *Id*. When items were sold, the buyers issued checks payable to her, but she admitted that, when her boyfriend "acquired" new items, she never issued or saw checks paying for them. *Id*.

Eventually, one of the boyfriend's burglaries went very wrong; he shot and killed a prominent physician during the commission of a burglary. *Id*. at 474, 475. The deceased's estate brought a wrongful death action, alleging that Hamilton and her boyfriend "engaged in a joint criminal venture and conspiracy" that led to the decedent's death. *Id*. at 474. After conducting a bench trial, the district court found Hamilton jointly and severally liable for this death. *Id*.

On appeal, the D.C. Circuit upheld the judgment against Hamilton, concluding that liability properly attached under both conspiracy and aiding-and-abetting theories. *Id*. at 474, 486−89. In upholding aiding-

and-abetting liability, the *Halberstam* court found that the first element—a tort that causes injury—was satisfied by the murder committed during the course of a burglary. *Id.* at 488. The second element—awareness of playing a role in an overall illegal or tortious activity—was likewise satisfied because the district court justifiably inferred that Hamilton "had a general awareness of her role in a continuing criminal enterprise." *Id.* The third element—knowing and substantial assistance—was also satisfied because the court also justifiably inferred that Hamilton knew her boyfriend "had engaged in illegal acquisition of goods." *Id.* The only question remaining was whether the defendant's assistance was "substantial." *Id.*

To determine substantiality, *Halberstam* applied five common law factors referenced in the Restatement (Second) of Torts and an additional, sixth factor it considered to be important under the facts of the case. *Id.* at 483–84, 488. Those six factors were: (1) the nature of the act assisted; (2) the amount of assistance provided; (3) whether defendant was present at the time the tort was committed; (4) defendant's relation to the tortious actor; (5) defendant's state of mind; and (6) the duration of the assistance. *Id.*

*Halberstam* noted that "the authors of the *Restatement* summarize these elements and explain why they create liability: '*Advice or encouragement to act operates as a moral support to a tortfeasor* and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance.'" *Halberstam*, 705 F.2d at 478 (quoting Restatement (Second) of Torts § 876, cmt. d) (emphasis added). The Second Restatement further elaborates that the defendant's assistance "may be so slight that he is not liable," but if the defendant has given "[a]dvice or encouragement" to the tortfeasor, he is liable for any "*other acts*" that are a "foreseeable" consequence of his advice or encouragement. Restatement (Second) of Torts § 876, cmt. d (emphasis added); *see also Halberstam*, 705 F.2d at 482 ("Vicarious liability can be based on acts of assistance as well as words of encouragement."). The *Taamneh* Court endorsed this Restatement, common-law approach for use in ATA aiding-and-abetting claims. *Taamneh*, 598 U.S. at 496.

Applying these six "substantiality" factors, the *Halberstam* court concluded that four of the six[3] showed that Hamilton's "assistance was indeed substantial enough to justify liability on an aider-abettor theory." *Halberstam*, 705 F.2d at 488. First, the "nature of the act assisted" was a "long-running burglary enterprise" to which defendant "gave not only her time and talents but also her name" to further that enterprise. *Id.* Second, the "amount of assistance" the defendant gave to the tortfeasor "may not have been overwhelming as to any" particular tort committed during defendant's five-year relationship with the tortfeasor, but the defendant's assistance "added up over time[.]" *Id.* Third, the "defendant's state of mind" was of "special importance" to the court because it was "knowing" and "evince[d] a deliberate, long-term intention to participate in an ongoing illicit enterprise"; it was "no passing fancy or impetuous act." *Id.* Finally, the "duration of the assistance" also "strongly influenced

_____

[3] The two factors missing in *Halberstam* were the defendant's presence at the time of the tort's commission and the defendant's relation to the tortious actor. *Halberstam*, 705 F.2d at 488. The lack of physical presence at the time of the tort's commission was not particularly important considering defendant's role in the criminal enterprise, and defendant's personal and romantic relationship to the defendant made the court "wary" and "cautious" not to overemphasize that relationship. *Id.*

[the court's] weighing" of substantiality, because the five-year duration of the assistance indicated that defendant herself understood "her role [in the enterprise] and the value of her assistance" to the tortfeasor. *Id.*

In short, as the *Taamneh* Court put it, "Hamilton's assistance to [her boyfriend] was so intentional and systematic that she assisted each and every burglary committed by [him] . . . ." *Taamneh*, 598 U.S. at 495. It was therefore unnecessary to show that Hamilton knew of each burglary committed by him; her five-year, consistent assistance as a bookkeeper and secretary for her boyfriend's illicit enterprise was sufficient to warrant imposing aiding-and-abetting liability upon her for the physician's murder, since burglaries are inherently dangerous activities that create a foreseeable risk of harm to others. "[I]t was enough," concluded the D.C. Circuit, "that she knew he was involved in *some type of personal property crime* at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises." *Halberstam*, 705 F.2d at 488 (emphasis added).

Here, as in *Halberstam*, first, the "nature of the act assisted" was a "long-running [ ] enterprise" of terrorism by Hamas, to which Defendants

"gave not only [their] time and talents but also [their] name" to further

that enterprise. *Halberstam*, 705 F.2d at 488. Second, the "amount of

assistance" that Defendants provided to Hamas—propaganda,

recruiting, and financial—"may not have been overwhelming as to any"

particular act of terrorism committed during Defendants' decades-long

relationship[4] with Hamas, but as in *Halberstam*, the Defendants'

assistance "added up over time[.]" *Id.* Third, as in *Halberstam*, the

Defendants' state of mind" is of "special importance in this case" because

it "evince[d] a deliberate, long-term intention to participate in an ongoing

illicit enterprise" by Hamas. *Id.* It was "no passing fancy or impetuous

act." *Id.* Finally, the "duration of the assistance" provided by Defendants

---

[4] Publicly available records of the Internal Revenue Service show that
Defendant AJP Educational Foundation (a.k.a., Americans Muslims for
Palestine) was formed as a 501(c)(3) nonprofit in 2010. Defendant
WESPAC Foundation has been filing as a 501(c)(3) nonprofit since at
least 2016. Defendant National Students for Justice in Palestine
("NSJP") is unincorporated but held its first national conference in 2011
at Columbia University. *See* Nat'l Conference: Students for Justice in
Palestine (New York, 14−16 October, 2011),
https://www.jadaliyya.com/Details/24307; Carly Silver, *Reporting Live
From the First-Ever SJP Nat'l Conference,* NEW VOICES, (Oct. 15, 2011),
https://newvoices.org/2011/10/15/reporting-live-from-the-first-ever-sjp-
national-conference/. The long-term relationship between Hamas and
individual Defendants Bazian, Abuirshaid, Herzallah, and Baroud is
documented in the Complaint. *See, e.g.*, JA035-JA036, JA042, JA045-
JA046, JA047, JA049, JA050, JA055, JA102.

should, as in *Halberstam*, "strongly influence[] [the court's] weighing" of substantiality, because the decades-long duration of the assistance creates a reasonable inference that Defendants understood their "role [in the Hamas enterprise] and the value of [their] assistance" to Hamas. *Id.*

In short, as with Hamilton's assistance in *Halberstam*, Defendants' "assistance to [Hamas] was so intentional and systematic that [they] assisted each and every [act of terrorism] committed by [Hamas]" because Hamas "relied on [Defendants'] assistance" via recruiting, propaganda, and financial support, to carry out is terrorist enterprise. *Taamneh*, 598 U.S. at 495. It was therefore unnecessary to show that Defendants knew in advance of each act of terror Hamas committed. Defendants' long-term, consistent aid to Hamas is sufficient—especially at the pleading stage—to adequately state a claim for ATA aiding-and-abetting liability. Like the burglary enterprise in *Halberstam*, Hamas's terrorist enterprise is an inherently dangerous activity that creates a foreseeable risk of harm to others, including the injuries suffered by Plaintiffs on October 7 and beyond.

The district court thus committed legal error by dismissing Plaintiffs' ATA aiding-and-abetting claim because they "fail[ed] to

plausibly allege even prior knowledge of the October 7, 2023, attack" or any other "facts showing a 'definable nexus' between Defendants' conduct and Hamas's October 7, 2023 attack." JA190. As demonstrated above, this is not the salient legal question under *Taamneh* and *Halberstam*. Instead, the court must assess whether Plaintiffs' Complaint plausibly alleges "pervasive and systemic aid" to Hamas sufficient to infer that Defendants "aided and abetted" each tort (act of terrorism) committed by Hamas. *Taamneh*, 598 U.S. at 506. A defendant that intends to provide systemic aid to a tortfeasor, as did Ms. Hamilton in *Halberstam*, need not know "all particulars of the primary actor's plan" and will be held liable for all "foreseeable consequences" of the primary tortfeasor's (e.g., Hamas's) tortious activity. *Id.* at 495−96.

If Hamilton's five-year assistance as a bookkeeper and secretary for her boyfriend's illicit enterprise was sufficient to warrant imposing aiding-and-abetting liability for the physician's murder in *Halberstam*, Defendants' decades-long assistance to Hamas—a known terrorist entity whose mission is to kill Jews and destroy Israel—is more than sufficient to impose the same liability for foreseeable acts of terrorism undertaken by Hamas, including the October 7 massacre, that killed thousands of

Jews in Israel and caused Plaintiffs' injuries. It is "enough," as the *Halberstam* court noted, that Defendants here "knew [Hamas] was involved in some type of . . . crime" because "violence and killing is a foreseeable risk" in a criminal enterprise, especially terrorism. *Halberstam*, 705 F.2d at 488. By knowingly providing material, systemic aid to Hamas's terrorist mission, Defendants aided and abetted that mission. The Complaint's allegations are more than sufficient to state a claim sufficient to survive a 12(b)(6) motion to dismiss. When someone tells you who they are over and over again, and when those facts are well-pled, the court must believe them.

## II. The district court erred in dismissing the Israeli Plaintiffs' ATS claims for lack of subject matter jurisdiction under Rule 12(b)(1)

The district court also erred in dismissing the Israeli Plaintiffs' ATS claims. With respect to the Israeli Plaintiffs' ATS claims, the district court's myopic focus on the events of October 7, 2023, caused the court to err three times over in its extraterritoriality analysis. First, the district court erred by focusing solely on the location of the Israeli Plaintiffs' injuries rather than location of the "relevant conduct" that constitutes Defendants' aiding and abetting, as required by the Supreme Court's and

this Court's precedents. Second, the district court erred by applying the incorrect standard for aiding-and-abetting liability under international law, again leading it to focus solely on Israeli Plaintiffs' injuries arising from October 7 rather than Defendants' full course of domestic conduct that constitutes aiding and abetting under international law. And third, the district court refused to treat Plaintiffs' injuries as ongoing, freezing Plaintiffs' injuries in time to those that occurred on October 7 and constraining the court's analysis to the detriment of Plaintiffs' well-pleaded allegations of ongoing harm.

**A.    The district court focused solely on the location of the Israeli Plaintiffs' injuries rather than the location of the "relevant conduct" constituting aiding and abetting**

In *Kiobel v. Royal Dutch Petroleum Co.,* the Supreme Court articulated the bounds of the presumption against extraterritoriality, as applied in ATS cases. 569 U.S. 108, 125 (2012). A plaintiff overcomes the presumption if the "relevant conduct" of the ATS claim "touch[es] and concern[s] the territory of the United States . . . with sufficient force." *Id.* at 124–25. In *Kiobel*, a group of former Nigerian residents who had been granted asylum in the United States sued foreign oil companies under the ATS for aiding and abetting the Nigerian government's violations of

international law. *Id.* at 113. Specifically, the plaintiffs alleged that the oil companies provided Nigerian forces with food, transportation, compensation, and a staging ground with which to carry out attacks on Nigerian villages where they beat, raped, killed, and arrested residents and destroyed residents' property. *Id.* at 114. The Court held that the presumption against extraterritoriality barred federal courts' ability to adjudicate the plaintiffs' ATS claims because the Defendant was a foreign corporate citizen and "all of the relevant conduct took place outside the United States." *Id.* at 113, 124.

In *Al Shimari v. CACI Premier Technology, Inc.*, this Court held that courts must conduct a careful assessment of the relevant conduct when applying *Kiobel*'s analysis to an ATS claim when allegations of relevant conduct do not exclusively occur abroad. 758 F.3d 516 (4th Cir. 2014). "[C]ourts should not assume that the presumption categorically bars cases that manifest a close connection to United States territory." *Id.* at 528. Rather, under *Kiobel*'s "touch and concern" test, "a fact-based analysis is required." *Id.* If the ATS claims "reflect extensive 'relevant conduct' in United States territory," courts must conduct "a more nuanced analysis . . . to determine whether the presumption has been

displaced." *Id.* Importantly, "it is *not sufficient* merely to say that because the *actual injuries* were inflicted abroad, the *claims* do not touch and concern United States territory." *Id.* (first and second emphasis added). Courts must consider "a broader range of facts than the location where the plaintiffs actually sustained their injuries." *Id.* at 529.

The *Al Shimari* Plaintiffs were foreign nationals who alleged that they were tortured by American civilian and military personnel at Abu Ghraib, a military facility operated by the United States government in Iraq. *Id.* at 521. The torture was conducted by employees of an American corporation headquartered in Virginia that had a contract with the U.S. government to provide interrogation-related services to the U.S. military. *Id.* at 521–22, 528–29. In addition, the corporation's U.S.-based managers were aware of and "implicitly, if not explicitly, encouraged" the torture abroad from within the United States. *Id.* at 529. The Court held that these facts overcame the presumption against extraterritoriality: "[W]e conclude that the ATS claims' connection to the territory of the United States and [the defendant's] relevant conduct in the United States require a different result than that reached in *Kiobel*," particularly since barring the claims "would not advance the purposes of the presumption."

*Id.* at 529. "A basic premise of the presumption" against extraterritoriality, this Court observed, is to prevent "'international discord' resulting from 'unintended clashes between our laws and those of other nations.'" *Id.* at 529−30 (quoting *Kiobel*, 569 U.S. at 115). When an ATS claim is asserted against Defendants who are U.S. citizens, any concerns about upsetting delicate foreign relations do not apply. *Id.* at 530.

This is consistent with approaches taken by this Court's sister circuits, which have also clarified that the "relevant conduct" of an aiding-and-abetting claim is the act of aiding and abetting—not the injury. For example, the Second Circuit acknowledged that *Kiobel*'s "touch and concern" language "appeared to leave open a window for ATS actions that are based in part on extraterritorial conduct." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014). To determine what "relevant conduct" was sufficient to displace the presumption against extraterritoriality, the Second Circuit proceeded to evaluate "the 'territorial event[s]' or 'relationship[s]' that were the 'focus' of the ATS." *Id.* at 184 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010)). The court concluded that the focus of the ATS is "the *conduct of*

*the defendant* which is alleged by plaintiff to be either a direct violation of the law of nations, or . . . conduct that constitutes aiding and abetting another's violation of the law of nations." *Id.* at 185 (emphasis added). The court held that "numerous New York-based payments and 'financing arrangements' conducted exclusively through a New York bank account" were sufficient "specific and domestic" allegations that touch and concern the United States, even though the plaintiffs' injuries arose outside the United States. *Id.* at 191.

Accordingly, when analyzing whether a plaintiff has pled sufficient facts to overcome the presumption against extraterritoriality in an ATS aiding-and-abetting case, a court must determine whether the *conduct* the plaintiffs allege to constitute aiding and abetting—not merely the plaintiffs' *injuries*—touches and concerns the United States.

Here, Plaintiffs' claims touch and concern the U.S. in several important ways. First, like in *Al Shimari*, the institutional Defendants are all domestic, U.S. businesses. JA035; *Al Shimari*, 758 F.3d at 530. Likewise, all four individual Defendants reside and work in the United

States.[5] Defendant Bazian is a Continuing Lecturer in the Department of Ethnic Studies at the University of California-Berkeley and the founder of the first NSJP chapter there. JA047.[6] Likewise, Defendant Abuirshaid is a U.S. citizen who, as Executive Director of AMP, lives and works in the Washington, D.C. area. JA135.[7] Defendant Herzallah lives in Anoka County, Minnesota, where he unsuccessfully ran for County Commissioner in November 2024.[8] He is presently a member of the Parks and Recreation Committee of the city of Columbia Heights, Minnesota,[9]

---

[5] While some of the facts presented in support of the individual Defendants' residency are not contained in the record, this Court "may properly take judicial notice of matters of public record," *Justice 360 v. Stirling*, 42 F.4th 450, 455 (4th Cir. 2022), including complaints, *United States ex rel. Rosales v. Amedisys N.C., LLC*, 128 F.4th 448, 554 (4th Cir. 2025), and government websites. *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017). The University of California-Berkeley, the University of Hawai'i-Manoa, and the University of Minnesota are all public universities.

[6] *See also* UC-Berkeley, Dept' of Ethnic Studies, Hatem Bazian, https://tinyurl.com/4rjh5urp.

[7] *See also* Joint Stipulation of Dismissal, *Abu Irshaid v. United States Citizenship & Immigr. Servs.*, No. 1:17-cv-402 (E.D. Va. Sept. 11, 2017), ECF No. 34 (dismissing Abuirshaid's lawsuit based on USCIS granting Abuirshaid naturalization).

[8] *See* Office of the Minn. Sec'y of State, Elections & Voting, Results for Selected Contests in Anoka Cnty., Cnty. Comm'r Dist. 7, https://tinyurl.com/3zs78jx9.

[9] Columbia Heights, Minn., Parks & Recreation Comm'n, https://www.columbiaheightsmn.gov/government/boards_and_commissions/parks_and_recreation_commission.php

as well as a researcher in the American Studies program at the University of Minnesota, College of Liberal Arts.[10] Defendant Baroud presently resides in Hawaii, where she is a Lecturer in the Department of Ethnic Studies at the University of Hawaiʻi at Manoa.[11] Because all Defendants work and reside in the U.S., the "basic premise of the presumption" against extraterritoriality—which is to prevent "'international discord' resulting from 'unintended clashes between our laws and those of other nations'" is not implicated by adjudicating Plaintiffs ATS claims in federal court. *Al Shimari*. 758 F.3d at 529−30 (quoting *Kiobel*, 569 U.S. at 115).

Second, the actions undertaken by the Defendants alleged in the Complaint virtually all occurred *within* the United States. The district court below held that the "relevant conduct" at issue for the ATS claims was "Plaintiffs' allegations regarding Defendants' conduct in the United

---

[10] *See* Univ. of Minn., College of Liberal Arts, Am. Studies, Taher Herzallah, https://cla.umn.edu/american-studies/news-events/profile/taher-herzallah.
[11] Univ. of Hawaiʻi at Manoa, Ctr. for Biographical Rsch., Brown Bag Biography: Fall 2025 (November 13, 2025 lecture by Baroud on "Prison as a Space of Elimination: The Role of Israel's Carceral System in the Ongoing Gaza Genocide."); *see also* Univ. of Hawaiʻi at Manoa, Faculty/Staff Directory, Zarefah R. Baroud, https://manoa.hawaii.edu/directory/index.php.

States *before* the October 7, 2023 attack in Israel," and that the presumption against extraterritoriality had not been overcome because the Defendants' "alleged actions in the United States [did not] have a sufficient causal connection to the *alleged harm*." JA174, JA180 (emphasis added). But, as discussed above, *Kiobel* and *Al Shimari* require a court to conduct a "more nuanced analysis" and consider "a broader range of facts than the location where the plaintiffs actually sustained their injuries." *Al Shimari*, 758 F.3d at 528–529. Had the court done so, it should have concluded that Plaintiffs pled sufficient facts to overcome the presumption against extraterritoriality.

Specifically, Plaintiffs extensively pled that for years, from almost *exclusively* within the United States, Defendants have waged a systematic, unrelenting campaign of support, pressure, and propaganda—for which they have been *thanked* by Hamas, the primary tortfeasors, and its supporters—to undermine Western democracy; instill widespread fear, particularly among Jewish college students; and compel changes in foreign policy that are favorable to Hamas. JA049-JA055, JA060-JA092, JA092-JA094. Plaintiffs have provided ample support for

such allegations.[12] These activities constitute the "relevant conduct" for the Plaintiffs' aiding-and-abetting claim, and this "relevant conduct" occurred exclusively in the United States. It is the Defendants' *domestic activities* of aiding and abetting Hamas's continued, systematic violations of international law that form a substantial basis of Plaintiffs' ATS claims. Because the district court mischaracterized the nature of Defendants' activities and focused instead on the nexus between Defendants and Plaintiffs *injuries*, as discussed above, the court erred in concluding that Plaintiffs did not overcome the presumption against extraterritoriality.

### B. The district court applied the incorrect standard for aiding-and-abetting liability under international law

The district court compounded its error by incorrectly defining the scope of aiding-and-abetting liability under international law,

---

[12] "In addition to the complaint, [a court] may consider 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (quoting *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308. 322 (2007)). The court "may also consider documents 'attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

erroneously limiting the universe of Defendants' relevant conduct to only conduct *preceding* October 7, 2023—as opposed to conduct occurring before, during, and after the October 7 terror attacks. When determining the contours of aiding-and-abetting liability under the ATS, federal courts rely on international law. *See Doe v. Cisco Sys.*, 73 F.4th 700, 717 (9th Cir. 2023) ("Questions as to the scope of liability under the ATS, including accomplice liability, are determined under international law and so are subject to *Sosa*'s two-part test. *Sosa* directed courts to international law to determine 'the scope of liability for a violation of a given norm.'") (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 n.20 (2004)); *see also Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 268–269 (2d Cir. 2007) (Katzmann, J., concurring) ("The district court's conclusion that its jurisdiction under the [ATS] should depend on whether international law specifically recognizes liability for aiding and abetting violations of the law of nations is consistent with our prior case law. We have repeatedly emphasized that the scope of the [ATS's] jurisdictional grant should be determined by reference to international law.").

It is well established under international law that the actus reus of aiding and abetting—particularly in the instance of war crimes—may take place before, during, or after the principal crime. *See, e.g., Prosecutor v. Popovic*, Case No. IT-05-88-A, Appeals Judgment, ¶ 1783 (Int'l Crim. Trib. for the Former Yugoslavia Jan. 30, 2015) ("The *actus reus* of aiding and abetting a crime may occur before, during, or after the principal crime has been perpetrated, and the location at which the *actus reus* takes place may be removed from the location of the principal crime.")[13]; *Prosecutor v. Mrkˇsiˊc*, Case No. IT-95-13/1-A, Appeals Judgment, ¶ 81 (Int'l Crim. Trib. for the Former Yugoslavia May 5, 2009)[14] (same).

The district court's insistence that "because Plaintiffs' injuries occurred on October 7, 2023, the Court must examine Plaintiffs' allegations regarding Defendants' conduct in the United States before the October 7, 2023, attack in Israel," JA180, thus misstates the actus reus of aiding-and-abetting liability and creates an artificially small universe of conduct from which to assess the validity of Israeli Plaintiffs'

---

[13] Available at
https://www.icty.org/x/cases/popovic/acjug/en/150130_judgement.pdf.
[14] Available at
https://www.refworld.org/jurisprudence/caselaw/icty/2009/en/92038.

claims. It also led the court to erroneously constrain its extraterritoriality analysis to Plaintiffs' allegations of Defendants' pre-October 7 conduct.

Israeli Plaintiffs allege that Defendants have aided and abetted Hamas's violations of international law, including genocide (JA034, JA036, JA056-JA0507), war crimes (JA056), terrorism (JA034, JA056-JA057), and supporting terrorism (JA103, JA105). Those principal offenses are ongoing. Even if the Court were to treat Israeli Plaintiffs' injuries as frozen in time, which they are not, Israeli Plaintiffs more than sufficiently plead relevant conduct occurring in the United States before, during, and after the October 7 terror attacks, including an organized fundraising, propaganda, and advocacy effort for the benefit of Hamas; a plethora of public relations activity; and long-term pressure campaigns designed to whitewash Hamas's unspeakable crimes and shore up support among young Americans for such terrorism, thereby undermining the legitimacy of Western governments. JA049-JA055, JA060-JA092. In response to such efforts, Defendants were recognized and applauded by Hamas and other FTOs. JA092-JA094.

In sum, Israeli Plaintiffs have more than met the burden under international law for pleading aiding-and-abetting liability under the

ATS. In shrinking the scope of relevant conduct to only conduct before October 7, 2023, the district court's analysis failed to comply with well-established principles of international law, as required by Supreme Court precedent, and the district court thereby committed reversible error.

### C. The district court erred by failing to treat the Israeli Plaintiffs' injuries as ongoing

Even if the Plaintiffs' injuries were relevant to the extraterritoriality analysis, the district court failed to properly understand the scope of their injuries. The district court erroneously froze the Plaintiffs' injuries in time to those that occurred on October 7, 2023. *See* JA180. But as the Complaint makes clear, it is the Defendants' systemic aiding and abetting of Hamas's *ongoing* violations of international law that also form the basis for Israeli Plaintiffs' ATS claims, not just the violations that occurred on October 7 alone.

Here, Israeli Plaintiffs allege a variety of injuries that are ongoing as Hamas has engaged in acts of terror against civilians before, during, and after October 7 that has directly harmed Israeli Plaintiffs. JA105. The Complaint makes clear that Defendants' *domestic acts* (such as fundraising, recruiting, and propaganda) systemically aided and abetted Hamas's *continuing* violations of international law, which began before

and have extended long after October 7, 2023, "including taking civilians hostage and directing explosives towards civilian and government areas within Israel." JA105. To that point, the Complaint cites Hamas's "ongoing terrorist activities directed at civilians" and its "terrorist activity both before, during, and after its October 7 terrorist attack" as harms that directly reach Israeli Plaintiffs. JA105. Defendants' acts of aiding and abetting Hamas's broad-based terror project are the focus of the ATS cause of action, not October 7 alone. These ongoing acts of terrorism caused Plaintiffs continued mental anguish, pain and suffering, and even property harms. JA032-JA034 (describing Plaintiffs' ongoing injuries due to Hamas terrorism).

By limiting the scope of relevant conduct to merely acts committed *before* October 7, 2023, the district court ignored Plaintiffs' claims of ongoing harms that began before and continued well past October 7, 2023. In doing so, the District Court committed reversible error.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and Plaintiffs' ATS and ATA claims should be reinstated.

# REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request oral argument. This appeal raises complex and important issues about what nexus must be demonstrated between a plaintiff's ATA aiding-and-abetting liability claims and a defendant's acts, when those claims are predicated on defendant's systemic aid to a designated terrorist organization. It also raises important issues regarding the proper application of the presumption against extraterritoriality to ATS claims when those claims derive from systemic aid provided to a designated FTO within the United States. Oral argument would thus substantially aid the decisional process.

Dated: December 23, 2025

Respectfully submitted,

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky
Va. Bar No. 47481
jtorchinsky@holtzmanvogel.com
Elizabeth Price Foley
DC Bar No. 1031589
efoley@holtzmanvogel.com
HOLTZMAN VOGEL BARAN TORCHINSKY
& JOSEFIAK PLLC
2300 N. Street NW, Suite 643
Washington D.C. 20037

Daniel Bruce
Va. Bar No. 98120
dbruce@holtzmanvogel.com
HOLTZMAN VOGEL BARAN TORCHINSKY
& JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808

Scott Bornstein
bornsteins@gtlaw.com
Richard Edlin*
edlinr@gtlaw.com
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200

Zachary Needell
zachary.needell@gtlaw.com
GREENBERG TRAURIG, LLP
401 East Las Olas
Boulevard, Suite 2000 Fort
Lauderdale, Florida 33301
(954) 765-0500

Mark Goldfeder
mark@jewishadvocacycenter.org
NATIONAL JEWISH ADVOCACY CENTER,
INC.
INTERNATIONAL LEGAL FORUM
1718 General George Patton Drive
Brentwood, TN 37027
(800) 269-9895

*Application for admission
forthcoming

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a). This brief contains 12,182 words, excluding the parts of the document exempted by Rule 32(f), as was prepared in fourteen-point Century Schoolbook font, a proportionally spaced typeface, using Microsoft Word.

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky
*Counsel for Plaintiff-Appellants*