# United States Court of Appeals

*for the*

# Fourth Circuit

MAYA PARIZER; ADIN GESS; NOACH NEWMAN; NATALIE
SANANDAJI; YONI DILLER; DAVID BROMBERG; LIOR BAR
OR; ARIEL EIN-GAL; HAGAR ALMOG,

*Plaintiffs-Appellants,*

– v. –

AJP EDUCATIONAL FOUNDATION INC., a/k/a American Muslims for
Palestine; NATIONAL STUDENTS FOR JUSTICE IN PALESTINE; WESPAC
FOUNDATION; HATEM BAZIAN; OSAMA ABUIRSHAID; TAHER
HERZALLAH; ZAREFAH BAROUD,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

## BRIEF OF *AMICI CURIAE* THE RIEDERS FOUNDATION
## AND MIDDLE EAST FORUM
## IN SUPPORT OF APPELLANT AND REVERSAL

CLIFFORD A. RIEDERS
RIEDERS, TRAVIS, DOHRMANN,
   MOWREY, HUMPHREY & WATERS
161 West Third Street
Williamsport, Pennsylvania 17701
(570) 323-8711

*Counsel for Amici Curiae*

CP COUNSEL PRESS   (800) 4-APPEAL • (389017)

# DISCLOSURE STATEMENT

Amicis Curiae are not corporations, have no parent corporations and issue no stock.

## TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ....................................................iv

STATEMENT OF INTEREST OF AMICUS CURIAE ..........................1

AUTHORSHIP ....................................................................2

FUNDING.........................................................................2

ARGUMENT .....................................................................3

    1.    OVERVIEW OF AMICI CURIAE ......................................3

    2.    SCIENTER AND PLEADING ..........................................6

          JASTA's FUNDAMENTAL PURPOSE...................................7

          POSITION OF AMICI ..................................................8

          SPECIFICS FOLLOW...................................................9

               1.    Prosecuting Aiding-and-Abetting Claims Involve Fact-Intensive Inquiries, and Courts Must Exercise Particular Caution Prior to Dismissing Such Claims ...........................9

               2.    Courts Should Infer Scienter When a Complaint Presents Plausible Allegations That a Particular Defendant Has Organizational and Operational Ties To a Primary Terrorist Actor ..........................9

               3.    Courts Should Follow the "Knowingly or Recklessly" Scienter Standard as Established in JASTA, as Intended By Congress, and as Applied in Halberstam .............13

4.      Courts Should Refrain from dismissing
        aiding and abetting claims when scienter
        allegations – are supported by plausible
        inferences that material support was given
        to an entity posing "a significant risk of
        committing acts of terrorism that threaten
        the security of nationals of the United
        States"....................................................................16

3.      RELATIONSHIPS ................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) ........................................................ 10, 11

*Boim v. Quranic Literacy Inst.*,
291 F.3d 1000 (7th Cir. 2002) ...............................................................9

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) ...............................................................10

*Fuld v. Palestine Liberation Org.*,
145 S. Ct. 2090 (2025).......................................................................4, 5

*Gonazlez v. Google LLC*,
598 U.S. 617 (2023)...................................................................... 10, 11

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)...................................................... 14, 15

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ..................................................................15

*Parizer v. AJP Educational Foundation, Inc.*,
2025 U.S. Dist. LEXIS 158917 (E.D. Va. 2025) ..................... 6, 13, 15

*Strauss v. Credit Lyonnais*, S.A.,
242 F.R.D. 199 (E.D.N.Y. 2007).........................................................4

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)................................................................... *passim*


**Statutes & Other Authorities:**

18 U.S.C. § 2333(d)(2)................................................................... 6, 13

136 CONG. REC. S4568–01 (1990) .......................................................4

162 Cong. Rec. S2846 (daily ed. May 17,2016) ...................................13

*"Attachment A: List of Unindicted Co-conspirators and/or Joint Venturers,"*
*United States v. Holy Land Foundation for Relief and Development*, Cr. No.

3:04-CR-240-G, Northern District of Texas (Dallas Div.), accessed December 24, 2025, *The Investigative Project on Terrorism* .................................................21

Benjamin Baird, "The Real Face of the Muslim American Society," American Spectator, May 9, 2019 .........................................................22

"Congressional Candidates Withdraw from Event at Jihadist Mosque," Focus on Western Islamism, August 15, 2022 ....................................28

F.R.A.P. 29 ...........................................................................................30

F.R.C.P. 12(b)(6) .............................................................................. 8, 16

"Federal Judge Hands Downs Sentences in Holy Land Foundation Case," U.S. Department of Justice, May 27, 2009 .........................................22

*First Amended Complaint for Declaratory and Monetary Judgment*, *Boim et al. v. American Muslims for Palestine et al.*, No. 1:17-cv-03591, U.S. District Court for the Northern District of Illinois, Eastern Division, December 17, 2019 ................................................................19

"Hamas victim's family get $156m," BBC News, December 8, 2004 ...................18

"IAP 5th Annual Convention," Islamic Association for Palestine, 2001 ...............25

Justice Against Sponsors of Terrorism Act, P.L. 114-222 § 2, 130 Stat. 852 (2016) ....................................................3

Justice Against Sponsors of Terrorism Act, P.L. 114-222 §2, 130 Stat. 852(a)(6) ....................................... 9, 14, 16

Justice Against Sponsors of Terrorism Act, P.L. 114-222 §2, 130 Stat. 852(a)(7) ....................................... 7, 14

Justice Against Sponsors of Terrorism Act, P.L. 114-222 §2, 130 Stat. 852(b) ..........................................7

Lorenzo Vidino, "The Hamas Networks in America: A Short History," Program on Extremism, October 2023 .......................................... 17-18

Marcy Oster, "'Chop off their heads,' children sing at a Muslim center's event in Philly," JTA, May 7, 2019 ...........................................23

Matthew Levitt, *Hamas*, London: Washington Institute for Near East Policy, 2006 ...............................19

*National Students for Justice in Palestine (NSJP)*, Institute for the Study of Global Anti-Semitism & Policy, 2024 .........................20

v

Peter Baker, "White House Disavows U.S. Islamic Group
    After Leader's Oct. 7 Remarks," *New York Times*, December 8, 2023 ..............22

Sam Westrop, "Islamic Relief Partnered with Senior Hamas Officials,
    including Son of Terror Leader Ismail Haniyeh," Focus
    on Western Islamism, April 4, 2024 ....................................................25

Sam Westrop, "National Security Council Embraces Official
    of Hamas-Contracted Charity," Focus on Western Islamism,
    September 20, 2024 ............................................................23

Sam Westrop, "Terror-Aligned Charity 'Human Appeal' Should
    Be Prosecuted, Not Publicly Funded," Focus on Western Islamism,
    August 26, 2025 ...............................................................24

Sam Westrop, "USAID Hands Almost $1 Million to Hamas Charity in Gaza
    Linked to Son of Terror Leader Ismail Haniyeh," Focus on Western Islamism,
    April 4, 2024 ................................................................24

"Students for Justice in Palestine (SJP)," Anti-Defamation League,
    October 19, 2023............................................................ 19, 20

"The U.S. Charitable Network That Subsidizes Hamas,
    and the Donors Behind It," Focus on Western Islamism,
    November 14, 2023.......................................................... 25, 26, 27, 28

U.S. Department of the Treasury, "Treasury Disrupts Sham
    Overseas Charity Networks Funding Hamas and the PFLP,"
    June 10, 2025 ...............................................................12

*United States of America v. Sabri Benkahla*, *Brief for the United States*,
    No. 07-4778, United States Court of Appeals for the Fourth Circuit,
    (accessed December 24, 2025), PDF file, *The Investigative Project
    on Terrorism* ...............................................................22

*United States v. Abdulqader and Odeh*, No. 3:04-CR-0240-P,
    Memorandum Opinion and Order (N.D. Tex. Mar. 26, 2009)............................21

## STATEMENT OF INTEREST OF AMICUS CURIAE

**The Rieders Foundation**, established more than thirty years ago as a non-profit organization, is dedicated to enhancing Jewish culture and the civil rights of the Jewish people. The Rieders Foundation combats all forms of anti-Jewish discrimination through litigation, including when the discrimination is expressed as anti-Israelism.

**The Middle East Forum ("MEF" or "the Forum")** is a nonprofit research organization founded in 1994 and headquartered in Philadelphia, Pennsylvania. The Forum promotes American interests in the Middle East through research, public education, and policy advocacy. MEF operates as a "think-and-do tank," combining rigorous scholarly analysis with direct engagement in counterterrorism policy, government relations, and legal affairs. The Forum publishes the *Middle East Quarterly*, a peer-reviewed journal, and maintains specialized research programs including Islamist Watch, which monitors domestic Islamist organizations, and Campus Watch, which reviews Middle East studies in North America.

**AUTHORSHIP**

This Brief was authored by Clifford A. Rieders, Esquire, in part, together with the work of other attorneys and researchers.

**FUNDING**

The only contribution of funds for this brief is by the Rieders Foundation to cover costs. No individual person contributed to funding the preparation of this brief.

**ARGUMENT**

## 1.   OVERVIEW OF AMICI CURIAE

The Justice Against Sponsors of Terrorism Act (JASTA) was enacted with two principal purposes: "[T]o deter terrorism, [and to] provide justice for victims." Justice Against Sponsors of Terrorism Act, Pub. L. No. 114–222, § 2, 130 Stat. 852 (2016). Permitting Petitioners in this case to proceed with discovery and litigation comports with both of these statutory purposes. On October 7th, 2023, Petitioners suffered unimaginable pain and torment at the hands of a ruthless terrorist organization intent on inflicting maximum harm, not only on October 7th but for years thereafter. A sustained wave of hate and violence followed, not only in Israel and abroad, but also on American soil. That activity, carried out by actors and groups in the United States, was fueled, supported, and endorsed by Hamas and other terrorist organizations in the Middle East. As part of a reciprocal and mutually reinforcing scheme to foment hatred and incite violence, those same United States groups provided material support, encouragement, and funding to the same foreign terrorist organizations (FTOs) that harmed and killed American and Israeli citizens on October 7th and thereafter. This is precisely the sort of conduct that the Antiterrorism Act of 1992 (ATA) and JASTA amendment were enacted to combat.

As prior litigation under the ATA and JASTA has shown, the United States, "has a substantial interest in fully and fairly adjudicating matters before its courts . .

. [w]hen that interest is combined with the United States's goals of combating terrorism, it is elevated to nearly its highest point." *Strauss v. Credit Lyonnais*, S.A., 242 F.R.D. 199, 214 (E.D.N.Y. 2007). Crucially, and highly relevant to this matter, our country "has a profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks." *Id.* This interest is evidenced by statutory intent and history, as Senator Charles Grassley stated when he introduced the ATA on the floor of the senate that it would, "strengthen our ability to both deter and punish acts of terrorism . . . . We must make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them the most: at their lifeline, their funds." *Id.* Chesney Decl. at 9 (quoting 136 CONG. REC. S4568–01 (1990), *see Strauss*, 242 F.R.D. at 214.

This unmistakable American interest in "combating terrorist financing" found support in our country's highest Court in the case of *Fuld v. Palestine Liberation Organization*. *Id.* at 216. Chief Justice Roberts, writing for the majority, affirmed the government's interest in, "permitting American victims of international terror to pursue justice in domestic courts." *Fuld v. Palestine Liberation Org*., 145 S. Ct. 2090, 2107 (2025). That opinion, concerning claims brought under ATA and subsequently the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), acknowledged that the PSJVTA, "should be liberally construed to carry

out the purposes of Congress to provide relief for victims of terrorism." *Id.* The same reasoning should be applied to this case. Petitioners provided comprehensive documentation of the connections and reciprocal relationship between Defendants and foreign terrorist organizations. There is no doubt more to be uncovered with respect to financial and otherwise material support on behalf of Defendants to FTOs if Petitioners are permitted to move forward with discovery. Just as the *Fuld* court recognized the "substantial weight" that should be afforded to statutes that Congress enacted to apply to a certain class of disputes, so too should JASTA be given the same weight with respect to granting Petitioners the greatest possible authority to further uncover the extensive network of terrorist financing occurring within our own borders. *Id.*

Petitioners have demonstrated credible, compelling, and extensive factual allegations linking Defendants to foreign terrorist organizations responsible for deadly and heinous attacks on American and Israeli citizens. Petitioners have also established the requisite nexus between Defendants activities in the United States to Hamas's ongoing rocket attacks and the keeping of hostages in violation of international law subsequent to the pogrom on October 7th. The Court should ensure that the victims of October 7th, the deadliest day for Jewish people since the Holocaust, receive the opportunity Congress intended for them.

## 2.    SCIENTER AND PLEADING

This case presents an opportune moment to clarify and sharpen the scienter pleading standard for aiding and abetting claims brought under the Justice Against Sponsors of Terrorism Act (**"JASTA"** or the **"Act"**), in accordance with Congress's intent and as directed to the specific entities and conduct JASTA was enacted to target.

JASTA imposes secondary liability on those who knowingly provide substantial assistance to designated terrorist organizations. 18 U.S.C. §2333(d)(2). Scienter is therefore a necessary element of aiding-and-abetting liability under JASTA, and such claims cannot survive dismissal absent plausible allegations that defendants acted with the requisite knowledge and intent. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023). In the present case, the lower court relied on *Taamneh* by applying a similarly-demanding pleading standard to dismiss petitioners' aiding and abetting claims. *Parizer v. AJP Educational Foundation, Inc.*, 2025 U.S. Dist. LEXIS 158917, at *68 (E.D. Va. 2025) (directly relying on *Taamneh*).

The respondents here stand in a materially different posture from the *Taamneh* defendants. Unlike the Twitter, Inc. defendant in *Taamneh* – a neutral, arms-length service provider with no alleged organizational or operational ties to terrorist actors – respondents in the present case are entities credibly alleged to maintain significant and sustained ideological, financial, or organizational connections to designated

terrorist organizations. *See Petitioners' First Amended Complaint For Damages and Jury Trial Demand, paras. 33-66.* This distinction alone warrants a nuanced, defendant-focused application of the scienter requirement articulated in *Taamneh*.

## JASTA's FUNDAMENTAL PURPOSE

Congress enacted JASTA with the expressed purpose of providing "civil litigants with the ***broadest possible basis*** … to seek relief against persons, entities, and foreign countries … that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States. (emphasis added)" *P.L. 114-222, §2, 130 Stat. 852(b)*.

This statement of purpose is not an abstract policy declaration without practical effect. It is the Congressional directive the Act was designed to implement. Congress recognized that to effectuate this purpose, victims of terrorist attacks must be provided "***full access*** to the court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries. (emphasis added)" *P.L. 114-222, §2, 130 Stat. 852(a)(7)*.

## POSITION OF *AMICI*

It is the position of *amici* that the broadest possible basis for relief and full judicial access is only guaranteed through a context-specific application of F.R.C.P. Rule 12(b)(6) that aligns with the purpose of JASTA. To remain faithful to the Congress's clear intent, the Fourth Circuit should enunciate a judicial policy directing federal district courts in the Fourth Circuit to:

1. Exercise particular caution before dismissing aiding-and-abetting claims, as such claims involve fact-intensive inquiries;

2. Infer scienter when a complaint presents plausible allegations that a particular defendant has organizational and operational ties to a primary terrorist actor, as distinct from facially-neutral service providers like Twitter, Google, and Facebook;

3. Apply the "knowingly or recklessly" scienter requirement Congress intended, not an actual knowledge requirement, when defendants are plausibly alleged to have organizational and operational ties to primary terrorist actors; and

4. Refrain from dismissing aiding-and-abetting claims when scienter allegations – whether directly pleaded or plausibly inferred – are not specifically directed at the underlying act of terrorism, so long as it can be plausibly inferred that material support was given to an entity posing "a significant risk of

committing acts of terrorism that threaten the security of nationals of the United States.**" *P.L. 114-222, §2, 130 Stat. 852(a)(6).*

## SPECIFICS FOLLOW

1. **P**rosecuting Aiding-and-Abetting Claims Involve Fact-Intensive Inquiries, and Courts Must Exercise Particular Caution Prior to Dismissing Such Claims

Aiding and abetting claims brought under JASTA are precisely those where robust factual discovery is indispensable, as courts recognize that such claims present a "classic factual dispute … not suitable for resolution on a motion to dismiss for failure to state a claim." *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1024 (7th Cir. 2002).

2. Courts Should Infer Scienter When a Complaint Presents Plausible Allegations That a Particular Defendant Has Organizational and Operational Ties To a Primary Terrorist Actor

It is the position of *amici* that, on the facts, the present case involves defendant entities that are fundamentally distinct from those in *Taamneh* and related jurisprudence, so as to warrant a modified application of the scienter standard that distinguishes between neutral, arms-length service providers and entities alleged to have strong and sustained ties to primary terrorist actors.

In *Taamneh*, the Supreme Court explained that "[t]he phrase 'aids and abets' … refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023). There, the

plaintiffs claimed that Twitter aided and abetted ISIS because Twitter "allegedly knew that ISIS was using [its] platform but failed to stop it from doing so." *Id*., at 478. The *Taamneh* plaintiffs never alleged that Twitter was established by ISIS, directed by or substantially controlled by ISIS, or that ISIS conducted its operations with the understanding and knowledge that it could rely on Twitter in furtherance of its terror activities. The *Taamneh* court similarly recognized that Twitter, like Google and Facebook, is a mass service provider with no operational or organizational ties to ISIS. *Id*., at 499 ("we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large. Nor do we think that such providers would normally be described as aiding and abetting." (citing Doe v. GTE Corp., 347 F.3d 655, 659 (7th Cir. 2003)). Given this "highly attenuated" relationship, the Taamneh court dismissed the underlying complaint in the absence of allegations that "defendants treated ISIS any differently from anyone else." *Id*., at 500.

Other courts have reached the same conclusion as to similarly-situated defendants. In *Gonzalez v. Google LLC*, the U.S. Supreme Court upheld the Ninth Circuit's dismissal of an aiding and abetting claim when plaintiffs merely "alleg[ed] that Google approved ISIS videos for advertisements and then shared proceeds with ISIS through YouTube's revenue-sharing system." *Gonazlez v. Google LLC*, 598 U.S. 617, 621 (2023). In *Ashley v. Deutsche Bank Aktiengesellschaft*, the Second

Circuit affirmed plaintiffs failed to plausibly allege aiding and abetting liability by asserting that defendant's banking services were used for tax fraud and money laundering schemes, the proceeds of which went to certain terrorist organizations. *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025).

The present case is fundamentally distinct from *Taamneh, Gonzalez, Ashley*, and those cases where the routine provision of services, without more, fails to satisfy the pleading standard for scienter. Here, the respondents are not neutral, third-party providers of services that coincidentally happened to produce an unintended benefit to Hamas and its affiliates. Not only have petitioners made out plausible allegations linking defendants to Hamas, but there exists substantial, credible documentation strongly suggesting that the respondents have strong organizational ties to Hamas and conduct their operations for the benefit of Hamas. The petitioners' operative complaint is replete with such allegations. *See Petitioners' First Amended Complaint For Damages and Jury Trial Demand, paras. 64-66.*

Substantial, credible evidence shows that Hamas solicits and garners support for its terror activities by facially legitimate means, As recently as June 10, 2025, the U.S. Department of the Treasury put out a press release announcing that its Office of Foreign Assets Control "sanction[ed] five individuals and five sham

charities located abroad that are prominent financial supporters of Hamas's Military Wing and its terrorist activities."[1]

Given this backdrop, it is the position of *amici* that courts should infer well-pleaded scienter allegations when plaintiffs plausibly allege organizational and operational links between secondary actors and the primary perpetrators of terrorist acts. Otherwise, plaintiffs – instead of being provided full access to the court system – would face the onerous burden of proving the factual allegations underpinning aiding and abetting liability prior to full development of the factual record. Holding plaintiffs – who plausibly allege extensive ties between secondary actors and primary terrorist organizations – to the exacting pleading standard applicable to aiding and abetting claims asserted against neutral defendants like Twitter, Google, and Facebook – would result in an unintentional windfall and reward to terror organizations, like Hamas.

Routinely dismissing aiding and abetting claims for lack of sufficient scienter allegations risks undercutting the entire purpose behind the enactment of JASTA. Indeed, a primary purpose driving JASTA's enactment was introducing "a responsible, balanced fix to a law that has ***extended too large a shield*** to foreign

---

[1] U.S. Department of the Treasury, "Treasury Disrupts Sham Overseas Charity Networks Funding Hamas and the PFLP", June 10, 2025. Available at: https://home.treasury.gov/news/press-releases/sb0162

actors who finance and enable terrorism on a massive scale. (emphasis added)." 162 Cong. Rec. S2846 (daily ed. May 17, 2016) (statement of Sen. Schumer).

Courts in the Fourth Circuit should thus give proper weight to allegations concerning the organizational and operational ties between alleged secondary actors and terror organizations, as well as the covert manner through which terror organizations like Hamas solicits and garners material support from those secondary actors.

3.  Courts Should Follow the "Knowingly or Recklessly" Scienter Standard as Established in JASTA, as Intended By Congress, and as Applied in Halberstam.

The Fourth Circuit should clarify that the proper standard to establish scienter under JASTA's aiding and abetting provision is the "knowingly or recklessly" standard. The lower court departed from the plain text of JASTA, as well as Congress's clear intent, by applying an actual knowledge standard and requiring plaintiffs to make out allegations that the defendants possessed actual knowledge of the specific October 7, 2023 attack. *Parizer v. AJP Educ. Found., Inc.*, 2025 U.S. Dist. LEXIS 158917, at **60-71, 73 (E.D. Va. 2025).

Reading JASTA as a whole favors a "knowingly or recklessly" standard. According to the plain statutory text, 18 U.S.C §2333(d)(2) imposes liability on persons or entities who aid and abet "by knowingly providing substantial assistance." 18 U.S.C §2333(d)(2). While this provision, read in isolation, appears

to reflect a more stringent actual knowledge standard, a contextual reading clearly favors a "knowingly or recklessly" test. Section 2(a) of JASTA, which sets forth Congress's clear findings underpinning the Act, calls for secondary liability to be imposed on those individuals and entities who have recklessly – not just knowingly – provided substantial assistance to those engaged in terrorist attacks. Section 2(a)(6) provides that,

> "Persons, entities, or countries that ***knowingly or recklessly*** contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities. (emphasis added)" *P.L. 114-222, §2, 130 Stat. 852(a)(6)*.

Similarly, Section 2(a)(7) provides that,

> "The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or countries that have ***knowingly or recklessly*** provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries. (emphasis added)" *P.L. 114-222, §2, 130 Stat. 852(a)(7)*.

*Halberstam*, which Congress intended to serve as the controlling legal framework for imposing aiding and abetting liability, applied this standard in substance. There, the court upheld the district court's inference that Linda S. Hamilton "knowingly" provided material assistance to the defendant's commission

of the underlying crime. *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983). In affirming the lower court's decision as to the scienter requirement, the court held that, "[i]t was not necessary that Hamilton knew specifically that Welch was committing burglaries." *Id*. It was enough that the manner in which Hamilton provided assistance was "in an unusual way under unusual circumstances." *Id*. The Second Circuit reiterated this standard by making reference to *Halberstam*, opining that Hamilton was, "not require[d] … to 'know' anything more about Welch's unlawful activities than what she knew for the general awareness element." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021).

Here, the District Court departed from *Halberstam's* application of the scienter requirement by requiring the plaintiffs to allege "prior knowledge" of the specific October 7, 2023 attack. Parizer v. AJP Educational Foundation, Inc., 2025 U.S. Dist. LEXIS 158917, at **60-71, 73. This represents a severe scienter standard that not only departs from the controlling standard as enunciated in *Halberstam*, but also fails to comport with JASTA's plain text and Congressional intent.

In light of the lower court's departure from the "knowingly or recklessly" standard as applied in *Halberstam*, this Court should enunciate the proper scienter standard and ensure its consistent application by federal district courts in the Fourth Circuit.

4.  Courts Should Refrain from dismissing aiding and abetting claims when scienter allegations – are supported by plausible inferences that material support was given to an entity posing "a significant risk of committing acts of terrorism that threaten the security of nationals of the United States."

To afford victims of terror the broadest possible relief and full access to the court system, this Court should give proper weight to Congress's intent to impose aiding and abetting liability when entities knowingly provide material support to those that "pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States." *P.L. 114-222, §2, 130 Stat. 852(a)(6)*.

Public policy supports applying JASTA to claims focused on the provisions relating to "aiding and abetting." At the very least, those claims where properly pled, should be subject to discovery.  The courts should be especially hesitant to dismiss such claims under 12(b)(6), precisely for the reason that terrorist organizations have evolved to conduct their activities in such a manner that would avoid civil liability. Hamas is not the unintentional beneficiary of a significant and well-funded propaganda campaign that supports its ongoing terror operations by helping to shape the public narrative and providing financial support. Hamas deliberately solicits participation and support from organizations like AJP, and depends on their cooperation and support to further its terrorist activities. The objective of Hamas is maximizing its support network while evading civil liability by making that support appear unintentional and innocent. Courts applying JASTA to aiding and abetting

claims should account for the constantly evolving strategies and *modus operandi* that are central to Hamas's terrorist operations: First, incorporating and weaponizing social media and activist initiatives as a central and concrete part of its strategy that furthers the very conduct and activities JASTA is meant to punish and deter; and second, by exploiting such channels and avenues of support for the purpose of evading civil liability.

## 3.    RELATIONSHIPS

For decades, Hamas has operated openly in the United States. In the 1990s and 2000s, Internal Hamas documents and FBI wiretaps revealed the existence of the Palestine Committee, formed in the late 1980s, whose goals included "increasing the financial and the moral support for Hamas," "fighting surrendering solutions," and publicizing "the savagery of the Jews."[2]   As the Program on Extremism at George Washington University explains, the Palestine Committee established public-facing organizations: the Islamic Association for Palestine (IAP), Hamas's activism arm; the Holy Land Foundation, Hamas's fundraising arm; and the United Association for Studies and Research (UASR), Hamas's thinktank arm.[3]

---

[2] Lorenzo Vidino, "The Hamas Networks in America: A Short History," Program on Extremism, October 2023. https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/2023-10/hamas-networks-final.pdf

[3] Lorenzo Vidino, "The Hamas Networks in America: A Short History," Program on Extremism, October 2023.

Decades later, following an intense but short-lived and incomplete effort by the federal government to close down Hamas operations, those key terror fronts have been replaced by a new array of organizations with similar missions: IAP has become the activist organization American Muslims for Palestine (AMP); and the Holy Land Foundation has been replaced by at least a dozen charitable organizations funding Hamas welfare operations in Gaza. These organizations today constitute the new Hamas network in the United States.

American Muslims for Palestine (AMP), which also operates under the name AJP Educational Foundation, and operates a 501(c)(4) organization named AJP Action, is widely and credibly accused of serving as successor to the Islamic Association of Palestine (IAP), which closed in 2004 after a federal court found it liable for Hamas's murder of a U.S. teenager named David Boim.[4] Matthew Levitt, an expert on Hamas and fellow at the Washington Institute, writes, "The IAP is intimately tied to the most senior Hamas leadership; in fact it was originally formed in 1981 by Dr. Aly Mishal at the personal direction of Khaled Mishal (…who would

https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/2023-10/hamas-networks-final.pdf
[4] "Hamas victim's family get $156m," BBC News, December 8, 2004. http://news.bbc.co.uk/2/hi/middle_east/4080499.stm

later become secretary general of Hamas) …. [T]he FBI noted that IAP officers were among the 'senior leaders of Hamas'…"[5]

American Muslims for Palestine emerged as IAP's successor. As the Anti-Defamation League (ADL) states: "AMP has its organizational roots in the Islamic Association of Palestine (IAP), an anti-Semitic group that served as the main propaganda arm for Hamas in the United States until it was dissolved in 2004. Since its creation in 2005, AMP continues to work closely with some former IAP leaders who currently hold positions as AMP board members."[6] A lawsuit filed by the family of David Boim alleges that AMP has "largely the same core leadership as IAP/AMS; it serves the same function and purpose; it holds nearly identical conventions and events with many of the same roster of speakers; it operates a similar 'chapter' structure in similar geographic locations; it continues to espouse Hamas' ideology and political positions; and it continues to facilitate fundraising for groups that funnel money to Hamas."[7]

The Institute for the Study of Global Anti-Semitism & Policy notes: "Some SJP chapters have declared their support for terrorist groups such as Hamas and

---

[5] Matthew Levitt, *Hamas*, London: Washington Institute for Near East Policy, 2006, Page 149.
[6] "Students for Justice in Palestine (SJP)," Anti-Defamation League, October 19, 2023. https://www.adl.org/resources/backgrounder/students-justice-palestine-sjp
[7] *First Amended Complaint for Declaratory and Monetary Judgment, Boim et al. v. American Muslims for Palestine et al.*, No. 1:17-cv-03591, U.S. District Court for the Northern District of Illinois, Eastern Division, December 17, 2019.

openly call for the dismantling of Israel as the homeland of the Jewish people. In fact, the SJP Toolkit, released after October 7, 2023, SJP openly declared themselves to be part of the "movement" (which refers to Hamas' October 7 attacks), and not just supporters.[8] Similarly, the Anti-Defamation League reveals: "In the days following Hamas's October 7, 2023, invasion of Israel, the national leadership of Students for Justice in Palestine (SJP) and many of the organization's campus chapters explicitly endorsed the actions of Hamas and their armed attacks on Israeli civilians and voiced an increasingly radical call for confronting and 'dismantling' Zionism on U.S. college campuses. Some SJP chapters issued pro-Hamas messaging and/or promoted violent anti-Israel messaging channels." Some SJP chapters, the ADL adds, even shared clips from Hamas's broadcasts of the October 7 pogrom.[9]

Both IANT and MAS were closely involved with the now-defunct Holy Land Foundation (HLF), a Texas-based humanitarian aid charity established by Muslim Brotherhood activists in support of the terrorist group Hamas. In 2009, a federal court ruled that the government had successfully shown the Palestine Committee's "stated mission of providing support to Hamas. … In furtherance of this mission, the evidence showed that the Palestine Committee established three organizations: HLF,

---

[8] *National Students for Justice in Palestine (NSJP)*, Institute for the Study of Global Anti-Semitism & Policy, 2024. https://isgap.org/wp-content/uploads/2024/05/Student_Justice_Palestine_Report.pdf

[9] "Students for Justice in Palestine (SJP)," Anti-Defamation League, October 19, 2023. https://www.adl.org/resources/backgrounder/students-justice-palestine-sjp

which raised money; the United Association for Studies and Research - UASR, which established policy; and the Islamic Association of Palestine - IAP, which disseminated information/propaganda."[10]

Following the 9/11 attacks, the Holy Land Foundation was investigated and shut down by the federal government, because of its open involvement with Hamas fundraising operations. In 2007, federal prosecutors named dozens of American Islamist groups and their officials as "unindicted co-conspirators" during a terrorism financing trial of Holy Land Foundation officials. A number of America's Islamist-run Muslim leadership groups, the government discovered, were part of an Islamist network working to fund terrorism abroad and advance extremism at home.[11]

In 1994, three leaders of Hamas's Islamic Association for Palestine (IAP) established the Council on American-Islamic Relations (CAIR). In 2009, the FBI blacklisted CAIR after federal prosecutors uncovered the Islamist group's close involvement with the Holy Land Foundation.[12] In fact, Ghassan Elashi, a senior

---

[10] *United States v. Abdulqader and Odeh*, No. 3:04-CR-0240-P, Memorandum Opinion and Order (N.D. Tex. Mar. 26, 2009), https://www.govinfo.gov/content/pkg/USCOURTS-txnd-3_04-cr-00240/pdf/USCOURTS-txnd-3_04-cr-00240-18.pdf. GovInfo
[11] "*Attachment A: List of Unindicted Co-conspirators and/or Joint Venturers*," *United States v. Holy Land Foundation for Relief and Development*, Cr. No. 3:04-CR-240-G, Northern District of Texas (Dallas Div.), accessed December 24, 2025, *The Investigative Project on Terrorism*. https://www.investigativeproject.org/documents/case_docs/423.pdf
[12] https://www.nationalreview.com/corner/holy-land-foundation-hamas-support-convictions-affirmed-andrew-c-mccarthy/

leader of the Holy Land Foundation, served as a key CAIR official in Texas. Elashi was sentenced to 65 years in prison in 2009 for funneling millions of dollars to Hamas.[13] In 2023, following Hamas's October 7 pogroms against Israeli civilians, the current CAIR head Nihad Awad declared he was "happy to see people breaking the siege and throwing down the shackles of their own land and walk free into" Israel.[14]

Muslim Brotherhood supporters established the Muslim American Society (MAS) in 1993.  Federal prosecutors have even explicitly declared that MAS was founded in 1993 as the "overt arm of the Muslim Brotherhood in America."[15] Speakers at MAS conferences have glorified jihad and praise the "mujahideen" in Palestine.[16] In 2019, local and national media in Philadelphia reported that the local branch of the Muslim American Society (MAS) hosted an event at its Al-Hidaya

---

[13] "Federal Judge Hands Downs Sentences in Holy Land Foundation Case," U.S. Department of Justice, May 27, 2009. https://www.justice.gov/archives/opa/pr/federal-judge-hands-downs-sentences-holy-land-foundation-case
[14] Peter Baker, "White House Disavows U.S. Islamic Group After Leader's Oct. 7 Remarks," *New York Times*, December 8, 2023. https://www.nytimes.com/2023/12/08/us/politics/white-house-cair-nihad-awad.html
[15] *United States of America v. Sabri Benkahla*, *Brief for the United States*, No. 07-4778, United States Court of Appeals for the Fourth Circuit, page 58 (accessed December 24, 2025), PDF file, *The Investigative Project on Terrorism*, https://www.investigativeproject.org/documents/case_docs/542.pdf#page=58
[16] Benjamin Baird, "The Real Face of the Muslim American Society," American Spectator, May 9, 2019. https://www.meforum.org/islamist-watch/the-real-face-of-the-muslim-american-society

mosque in North Philadelphia, at which young children from an MAS-run school sang and read poetry about the killing of Jews. Broadcast on MAS's Facebook page, the "Ummah Day" event at the MAS mosque featured children chanting: "We will chop off their heads, and we will liberate the sorrowful and exalted Al-Aqsa Mosque. We will lead the army of Allah fulfilling His promise, and we will subject them to eternal torture."[17]

In late 2024, officials of the Michigan charity Rahma Worldwide, for instance, repeatedly met, presented gifts, and signed contracts with Hamas minister Ghazi Hamad—a member of Hamas's politburo—along with other terror officials at the Ministry of Social Development. Weeks after the October 7 attacks, Hamad promised that Hamas would repeat the attacks "time and again until Israel is annihilated."[18]

Ghazi Hamad's terror ministry also refers, on multiple occasions, to partnerships with Islamic Relief, an international Islamist charity headquartered in the United Kingdom with a significant U.S. branch that has raised hundreds of millions of dollars. Islamic Relief branches also funded, partnered, and held events

[17] Marcy Oster, "'Chop off their heads,' children sing at a Muslim center's event in Philly," JTA, May 7, 2019. https://www.jta.org/quick-reads/chop-off-their-heads-children-sing-at-a-muslim-centers-event-in-philly
[18] Sam Westrop, "National Security Council Embraces Official of Hamas-Contracted Charity," Focus on Western Islamism, September 20, 2024. https://www.meforum.org/fwi/fwi-research/national-security-council-embraces-official-of-hamas-contracted-charity

with a Hamas charity in Gaza named the Bayader Association for Environment and Development, just months before the October 7 attacks. One of these events was attended by Hamas official Abdul Salam Haniyeh, son of the terror group's late political leader Ismail Haniyeh. Founded in 2007, shortly after Hamas's takeover of the Gaza Strip, Bayader's 2021 report notes "coordination" and "meetings" with Hamas's Ministry of Interior, Ministry of Works, Ministry of Social Affairs and Ministry of Agriculture. Another major U.S. charity, the American Near East Refugee Agency (ANERA), is also a long-standing partner of Bayader.[19]

Human Appeal continues to fund Hamas proxies and supporters in Gaza. Since 2020, Human Appeal's accounts report it has handed 4.7 million GBP ($6 million USD) to the Islamic Zakat Society (IZS).[20] Also known as the Gaza Zakat Committee, IZS is a leading charitable partner of Hamas. IZS, whose website pledges "steadfast soldiers" for "Jerusalem," operates joint events with Hamas government departments and its police force, under the supervision of Hamas leaders. Hamas officials even declared at an IZS sponsored event "attended by the leadership of the *Hamas* movement in eastern Gaza" that students trained at an IZS

---

[19] Sam Westrop, "USAID Hands Almost $1 Million to Hamas Charity in Gaza Linked to Son of Terror Leader Ismail Haniyeh," Focus on Western Islamism, April 4, 2024. https://www.meforum.org/usaid-hands-almost-1-million-to-hamas-charity-in

[20] Sam Westrop, "Terror-Aligned Charity 'Human Appeal' Should Be Prosecuted, Not Publicly Funded," Focus on Western Islamism, August 26, 2025. https://www.meforum.org/human-appeal

institution will "return our lands to us" through "the power of jihad." IZS has also received support from branches of the Islamic Relief franchise.[21]

There is a significant overlap in staff and officials between Hamas-aligned humanitarian aid charities operating as 501(c) organizations. United Mission for Relief & Development (UMR), also known as United Muslim Relief, is an international charity currently led by Abed Ayoub, the former President of Islamic Relief USA.[22] UMR officials have included pro-Hamas activists such as Khalid Turaani, who previously ran American Muslims for Jerusalem (AMJ), a close former partner of Hamas's Islamic Association of Palestine.[23] At a 2002 AMJ conference, the Investigative Project on Terrorism states, Turaani stated: "Allah will allow you to conquer the land of Palestine. Its men, its women, and its servants are in a state of jihad until the Day of Judgment." In Gaza, UMR supports the Hamas-linked UFA.

[21] Sam Westrop, "Islamic Relief Partnered with Senior Hamas Officials, including Son of Terror Leader Ismail Haniyeh," Focus on Western Islamism, April 4, 2024. https://www.meforum.org/islamic-relief-partnered-with-senior-hamas

[22] "The U.S. Charitable Network That Subsidizes Hamas, and the Donors Behind It," Focus on Western Islamism, November 14, 2023. https://www.meforum.org/the-us-charitable-network-that-subsidizes-hamas

[23] "IAP 5th Annual Convention," Islamic Association for Palestine, 2001. https://www.investigativeproject.org/documents/1114-iap-5th-annual-convention-chicago-2001.pdf

It also advertises, along with other American Islamist charities such as Medglobal, in Hamas newspapers.[24]

UMR's Vice President of Fundraising was Omar Shahin, a former official of Islamic Relief who later became vice-president of United Hands Relief & Development (UHR), also known as Bait al-Khair. Shahin, who called in 2002 for the killing of Jews, previously served as a fundraiser for KindHearts, a charity the Treasury Department shut down after finding it had "coordinated with Hamas leaders and made contributions to Hamas-affiliated organizations." The head of UHR, which supports the Hamas-linked Generosity Association in Gaza, is Suleiman Alghanem, a former official of Baitulmaal. And indeed, UHR's 2016 tax return even recorded its original name as Baitulmaal Relief and Development. In Gaza, an anti-Semitic official of the Hamas-linked charity UFA, Amjad Mansour, claims to have worked also for Baitulmaal and United Hands Relief.[25] Similarly, Baitulmaal official Yousef Abdallah is a former senior Islamic Relief official.

Other U.S. Islamist nonprofits operating in Gaza include 501(c) Reach Education Fund. Ahmed Gebreel, director of Reach's Palestine Office, has referred

---

[24] "The U.S. Charitable Network That Subsidizes Hamas, and the Donors Behind It," Focus on Western Islamism, November 14, 2023. https://www.meforum.org/the-us-charitable-network-that-subsidizes-hamas
[25] "The U.S. Charitable Network That Subsidizes Hamas, and the Donors Behind It," Focus on Western Islamism, November 14, 2023. https://www.meforum.org/the-us-charitable-network-that-subsidizes-hamas

to himself as a follower of Hitler, approvingly noting the Nazis had wiped out millions of "impure" Jews. Ayyad Yassin, Reach's current chairman, has published "congratulations to all our people in Gaza" following Hamas's killing of Israeli soldiers, as well as praise for a terrorist attack by Hamas's Qassam Brigades.[26]

In 2023, Pious Projects openly boasted that it handed $50,000 to the Hamas government to purchase medical supplies. Pious Projects also works with the Hamas-front group UFA. Pious Projects' chief Gaza partners include Mohammed Ahmed, a Gazan who announced in 2009 that his cousin had become a senior Hamas minister. Ahmed also regularly posts violent sermons by Hamas-affiliated clerics urging "jihad" against Jews as the only means for "salvation." Following the October 7 2023 attacks, Pious Project announced that its team on the ground in Gaza is led by its chief coordinator, Isaac Hilles (also known as Ishaq Hesham Halas). Hilles is a close relation of convicted terrorist Riad Hilles, a convicted terrorist whom, Isaac claims with much admiration, "killed Israeli officers and soldiers" as well as a "prison snitch" while serving time for his crimes in an Israeli prison. Pious Projects' Gaza coordinator also posts support for other terrorists, such as senior Hamas

---

[26] "The U.S. Charitable Network That Subsidizes Hamas, and the Donors Behind It," Focus on Western Islamism, November 14, 2023. https://www.meforum.org/the-us-charitable-network-that-subsidizes-hamas

commander Abdullah Ghaleb Barghouti, whom Isaac notes "killed 67 Zionists in 2002 and 2003."[27]

Mosque Foundation official Kifah Mustapha served as imam from 2002 to 2014. He was previously a member of the Hamas-aligned Islamic Association of Palestine. In an exhibit entered into evidence during the Holy Land Foundation trial, Mustapha was recorded chanting: "O mother, Hamas for Jihad. Over mosques' loudspeakers, with freedom. Every day it resists with stones and the dagger. Tomorrow, with God's help, it will be with a machine gun and a rifle." Counter-terrorism analysts have noted that multiple other officials of the Mosque Foundation have been involved with Hamas network organizations. For instance, Muhammad Salah was sentenced to five years in an Israeli prison in 1995, while serving on the Mosque Foundation's Executive Committee, reportedly for funneling $650,000 to members of the designated terrorist organization Hamas. The *New York Times*, meanwhile, has reported on Israeli accusations that the mosque's leader, Jamal Said, is "a senior Hamas official in the United States."[28]

---

[27] "The U.S. Charitable Network That Subsidizes Hamas, and the Donors Behind It," Focus on Western Islamism, November 14, 2023. https://www.meforum.org/the-us-charitable-network-that-subsidizes-hamas

[28] "Congressional Candidates Withdraw from Event at Jihadist Mosque," Focus on Western Islamism, August 15, 2022. https://www.meforum.org/congressional-candidates-withdraw-from-event

These dozens of mosques, charities and activist groups today advance the agenda of Hamas in the United States of America.

Respectfully submitted,

RIEDERS, TRAVIS, DOHRMANN,
MOWREY HUMPHREY & WATERS

Dated:   12/30/2025          By: /s/ Clifford A. Rieders, Esquire
                             Clifford A. Rieders, Esquire
                             Admitted to the 4th Circuit 12/27/19
                             161 W. Third Street
                             Williamsport, PA  17701
                             570-323-8711
                             COUNSEL FOR:
                             THE RIEDERS FOUNDATION
                             MIDDLE EAST FORUM
                             AMICUS FOR APPELLANTS,

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type - volume, typeface, and type - style requirements of Federal Rule of Appellate Procedure 29. This brief contains **5933** words, excluding the parts of the document exempted by Rule 32 (f), as was prepared in fourteen – point Times New Roman font, a proportionally spaced typeface, using Microsoft Word.

RIEDERS, TRAVIS, DOHRMANN,
MOWREY HUMPHREY & WATERS

Dated:   12/30/2025          By: /s/ Clifford A. Rieders, Esquire
Clifford A. Rieders, Esquire
Admitted to the 4th Circuit 12/27/19
161 W. Third Street
Williamsport, PA  17701
570-323-8711
COUNSEL FOR:
THE RIEDERS FOUNDATION
MIDDLE EAST FORUM
AMICUS FOR APPELLANTS,