No. 25-2366

IN THE
# United States Court of Appeals for the Fourth Circuit

---

MAYA PARIZER, *et al.*,

*Plaintiffs-Appellants*,

v.

AJP EDUCATIONAL FOUNDATION INC., *et al.*,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:24-cv-00724-RDA-IDD
(The Honorable Rossie D. Alston, Jr.)

---

## BRIEF OF AMICI CURIAE VIRGINIA, IOWA, AND 23 ADDITIONAL STATES IN SUPPORT OF APPELLANTS

---

JASON S. MIYARES
Attorney General of Virginia
KEVIN M. GALLAGHER
*Solicitor General*

202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 - Telephone
(804) 786-1991 - Facsimile
kgallagher@oag.state.va.us

BRENNA BIRD
Attorney General of Iowa
ERIC H. WESSAN
*Solicitor General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov

December 30, 2025    *Counsel for Amici States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION AND INTEREST OF *AMICI* CURIAE
STATES ..................................................................................... 1

SUMMARY OF THE ARGUMENT ............................................. 4

BACKGROUND .......................................................................... 5

ARGUMENT ................................................................................ 9

    I.    States have an interest in ensuring supporters of
        terrorism are held accountable ............................. 10

    II.   The ATA is the most effective tool for these
        Plaintiffs to attempt to receive compensation
        from Defendants .................................................... 14

    III.  Recent Supreme Court opinions highlight the
        need for flexibility and broad interpretation in
        ATA cases .............................................................. 21

CONCLUSION ............................................................................ 29

COUNSEL FOR ADDITIONAL AMICI STATES ................... 30

CERTIFICATE OF COMPLIANCE .......................................... 32

CERTIFICATE OF SERVICE .................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bay v. Commonwealth*,
729 S.E.2d 768 (Va. App. 2012) ........................................................ 11

*Boim v. Holy Land Found. For Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) .............................................................. 6

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*,
291 F.3d 1000 (7th Cir. 2002) ........................................................... 16

*Cook Cnty., Ill. v. United States ex rel. Chandler*,
538 U.S. 119 (2003) ........................................................................... 18

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) ............................................................. 21, 27, 28

*Kindhearts v. Geithner*,
647 F. Supp. 2d 857 (N.D. Ohio 2009) ............................................. 7

*Knox v. Palestine Liberation Org.*,
442 F. Supp. 2d 62 (S.D.N.Y. 2006) ................................................ 19

*Linde v. Arab Bank, PLC*,
706 F.3d 92 (2d Cir. 2013) ................................................................ 18

*Mason v. Machine Zone, Inc.*,
851 F.3d 315 (4th Cir. 2017) ............................................................. 5

*Osio v. Moros*,
2023 WL 5019877 (S.D. Fla. July 19, 2023) ................................... 13

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
530 F. Supp. 2d 216 (D.D.C. 2008) .................................................. 19

*Stansell v. Revolutionary Armed Forces of Columbia*,
2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022) .......................... 18, 19

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
    304 F. Supp. 2d 232 (D.R.I. 2004) ...................................................... 19

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) .................................................................. *passim*

*United States v. Morrison*,
    529 U.S. 598 (2000) ........................................................................ 10

**Statutes**

42 Pa.C.S. § 8318................................................................................ 12, 13

18 U.S.C. § 2331 .................................................................................... 16

18 U.S.C. § 2333 ................................................................ 15, 22, 23, 25

18 U.S.C. § 2339A ................................................................................. 12

18 U.S.C. § 2339B ............................................................................... 3, 11

720 Ill. Comp. Stat. Ann. 5/29D-29.9 .................................................. 12

Ala. Code § 13A-10-153 ....................................................................... 12

Ariz. Rev. Stat. Ann. § 13-2308.01 ...................................................... 12

Ark. Code Ann. § 5-54-202 ................................................................... 12

Fla. Stat. Ann. § 775.33, 720 ............................................................... 12

Fla. Stat. § 775.30 ................................................................................. 13

Ind. Code § 35-46.5-2-5 ........................................................................ 12

Iowa Code ch. 708A.4 .......................................................................... 3, 12

La. Civ. Code Ann. art. 2315.9 ............................................................. 12

Mich. Comp. Laws Ann. § 750.543k ..................................................... 12

Mo. Rev. Stat. Ann. § 576.080 .............................................................. 12

N.J. Rev. Stat. 2C:38-5.......................................................................... 12

iv

Nev. Rev. Stat. Ann. § 202.445 ............................................................ 12

Ohio Rev. Code Ann. § 2909.22 ........................................................... 12

Pub. L. 104-132, Title III, § 301 ..................................................... 3, 10

Tenn. Code § 39-13-807 ....................................................................... 12

Va. Code § 18.2-46.5 ...................................................................... 3, 12

**Other Authorities**

138 Cong. Rec. S17252-04 (1992) ......................................................... 17

*Antiterrorism Act of 1990*, Hearing Before the Subcommittee
    on Courts and Administrative Practice of the Senate
    Committee on the Judiciary, 101st Cong., 2nd Sess. (July
    25, 1990) ...................................................................................... 17

*Antiterrorism Act of 1991*, Hearing Before the Subcomm. on
    Intellectual Property & Judicial Admin. of the H. Comm.
    on the Judiciary, 102d Cong. 10 (1992) ......................................... 17

Exec. Order No. 14,362, Designation of Certain Muslim
    Brotherhood Chapters as Foreign Terrorist Organizations
    and Specially Designated Global Terrorists (Nov. 24,
    2025), https://tinyurl.com/38ue5kjj; ............................................... 6

H.R. Rep. No. 102-1040 ....................................................................... 15

News Release, Jason Miyares, Attorney General of Virginia,
    Attorney General's Office Opens Investigation Into
    American Muslims for Palestine Nonprofit (Oct. 31, 2023) .............. 20

News Release, Jason Miyares, Attorney General of Virginia,
    Virginia Court Orders American Muslims for Palestine to
    Produce Records Requested by Attorney General Miyares,
    https://tinyurl.com/yy7ryuck ........................................................... 20

Shirin Sinnar, *Separate and Unequal: The Law of "Domestic"
    and "International" Terrorism*, 117 Mich. L. Rev. 1333,
    1339 (2019) .................................................................................... 11

Tex. Gov. Proclamation, Designating the Muslim
  Brotherhood and CAIR as Foreign Terrorist and
  Transnational Criminal Organizations (Nov. 18, 2025),
  https://tinyurl.com/59jbfwz6................................................................6

## INTRODUCTION AND INTEREST OF *AMICI* CURIAE STATES

On October 7, 2023, designated terrorist organization Hamas began a massive terror attack against Israel, culminating in the worst slaughter of Jews since the Holocaust. Such terrorism is, of course, illegal. But just as illegal is providing material support to the terrorists and terror organizations that perpetrated the attack.

Providing material support to designated terrorist organizations like Hamas violates federal law—as well as the laws of many States. Defendants Americans for Muslims in Palestine ("AMP") and the National Students for Justice in Palestine ("NSJP") declared on October 8, 2023, that they were "PART of" a "Unity Intifada" under Hamas's "unified command." JA62. They should be taken at their word. And just like their predecessor organizations—convicted or admitted material supporters of Hamas—they should be held accountable. The district court's decision to dismiss the Anti-Terrorism Act ("ATA") claims before discovery and a chance to prove these incredibly disturbing allegations was a disservice to the very purpose of the ATA. Premature dismissal neuters laws that were carefully constructed by Congress to impose liability on the very actions alleged here.

1

Attorneys General, as their States' chief law enforcement officers, have a deep interest in holding terrorists and their supporters accountable. That accountability helps ensure that citizens of their States receive financial compensation from the individuals and organizations who supported the terrorists that engaged in the horrific attacks that harmed family members and loved ones—fully acknowledging that no amount of financial compensation can ever make up for the tragic losses these citizens have experienced.

The Attorneys General of Virginia, Iowa, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming (collectively, *Amici* States) thus submit this *amici curiae* brief in support of Plaintiffs as they seek to hold organizations that materially support Hamas accountable. Plaintiffs' claims, brought by "survivors of Hamas's October 7 terrorist attack, family members of those murdered by Hamas, civilians still under fire from Hamas's ongoing terrorism, and persons displaced by Hamas's ongoing terrorism," tells a disturbing story of AMP and NSJP serving as

"the propaganda and recruiting wing of a Foreign Terrorist Organization in the United States." JA32. The district court erred in dismissing Plaintiffs' claims.

Material-support statutes recognize that organizations like Hamas "are so tainted by their criminal conduct that any contribution to such an organization facilitates that [criminal] conduct." Pub. L. 104-132, Title III, § 301(a)(7). Federal law has long made the knowing provision of material support to designated foreign terrorist organizations like Hamas illegal. See, *e.g.,* 18 U.S.C. § 2339B. Many States also prohibit providing material support for terrorism. See, *e.g.*, Iowa Code ch. 708A.4; Va. Code § 18.2-46.5. States thus have an important interest in making sure that violations of material support statutes can be enforced.

Defendants here are alleged to have provided material support for Hamas, the brutal terrorist regime that not only oppresses millions in Gaza but that also murdered more than a thousand innocents and kidnapped hundreds more. States have an interest in ensuring that valid claims brought under material support statutes are allowed to be litigated in court and that any violators are held accountable.

## SUMMARY OF THE ARGUMENT

**I.**     States have a vital interest in holding accountable individuals and groups that materially support foreign terror organizations. Indeed, material support can sometimes be more effective than direct funding. For instance, public relations support is crucial to foreign terror organizations seeking to spread their fearful message from abroad. Straightforward application of longstanding law should allow accountability for those who materially support such bad actors.

**II.**     Civil liability for materially supporting terrorism is exactly what federal antiterrorism laws intend to provide. Ensuring that those laws may be used in addition to and apart from potential criminal liability is a vital tool in the toolbox—a tool that Congress created for a clear purpose.

**III.** The Supreme Court has repeatedly (and recently) weighed in to support a straightforward textual reading of federal antiterrorism statutes and authorize accountability in federal courts. The ATA is a statute that follows the back-and-forth conversation between the Courts and Congress—as the latter has responded to adverse rulings to ensure

standing and subject matter jurisdiction exist to stop those supporting

foreign terror organizations like Hamas.

## BACKGROUND

As alleged in the dismissed complaint,[1] AMP and NSJP did not

begin their material support for Hamas on October 8, 2023; rather, their

material support has been going on for decades—both as the current

organizations and through predecessor entities. Indeed, AMP was

founded after a predecessor organization and five of its board members

were convicted of providing material support for Hamas. See JA39–41.

AMP in turn founded NSJP, which disseminates pro-Hamas propaganda

on college campuses throughout the country, JA54–55, and both AMP

and NSJP have supported Hamas generally and specifically as to the

October 7 massacre in Israel, JA60–63.

First, the Muslim Brotherhood founded the "Palestine Committee"

in 1988 to fund the terrorist organization Hamas. JA38–39. Since the

start of this litigation, both the federal government and multiple States

---

[1] For purposes of this Court's review of the district court's dismissal of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the relevant facts are those alleged in Plaintiffs' complaint. See *Mason v. Machine Zone, Inc.*, 851 F.3d 315, 319 (4th Cir. 2017).

have begun or completed the process to designate the Muslim Brotherhood as a foreign terrorist organization. See, *e.g.*, Exec. Order No. 14,362, Designation of Certain Muslim Brotherhood Chapters as Foreign Terrorist Organizations and Specially Designated Global Terrorists (Nov. 24, 2025), https://tinyurl.com/38ue5kjj; Tex. Gov. Proclamation, Designating the Muslim Brotherhood and CAIR as Foreign Terrorist and Transnational Criminal Organizations (Nov. 18, 2025), https://tinyurl.com/59jbfwz6. The Palestine Committee comprised several organizations providing Hamas financial, informational, and political support. See JA38. Among those organizations were the Holy Land Foundation for Relief and Development and the Islamic Association for Palestine ("IAP"), organizations founded and controlled by senior members of Hamas leadership. JA39–40.

In 2001, the United States Office of Foreign Asset Control designated the Holy Land Foundation a terrorist organization. JA40. In 2008, the Holy Land Foundation and five of its leaders were convicted of providing material support to Hamas. See *Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d 685, 701 (7th Cir. 2008). Other organizations founded by the same group of individuals (and their friends and family

6

members) were also dissolved because they too materially supported Hamas. See, *e.g.*, *Kindhearts v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2009).

In 2006, some of the senior Holy Land Foundation leaders founded AMP. See JA41. AMP in turn founded its fiscal sponsor, AJP Educational Foundation, Inc., in 2008 and its campus advocacy wing, NSJP, in 2010. JA51–52, JA54. These successor organizations to the Holy Land Foundation, with overlapping founders and senior members, are now alleged to be engaged in the same type of material support for terror that led to the Foundation and five of its board members being convicted for providing material support to Hamas. See, *e.g.*, JA42 ("While these individuals have adopted AMP as their new corporate form, there can be no doubt that they retain the same mission they always have: to provide ongoing, systematic, material support to Hamas and its allies."); JA55 ("There is no indication that AMP, NSJP, or the individuals affiliated with them . . . ever ceased providing material support to Hamas and its affiliates—even in the transition period between IAP and AMP.").

Hamas's charter calls on its supporters to provide strategic depth and to engage in communication and propaganda campaigns on its

behalf. JA58. Within hours of the October 7 attack, Hamas terrorist leader Ismail Haniyeh called for the "resistance abroad" to join the battle. JA60. The head of Hamas's diaspora office, and founder of one of AMP's predecessor organizations, echoed that call. JA60. And Defendants answered the call by releasing their toolkit which made clear their participation in the October 7 attack and explained how their members could continue to support Hamas in its aftermath. JA60–63.

In support of those efforts, Defendants provide public relations and communications assistance for Hamas. Although Hamas, a designated foreign terror organization, cannot hire American public relations firms to advocate on its behalf, Defendants can act as one themselves. JA99–100. And Hamas has adopted messaging coming from Defendants. See JA76–77. Indeed, whenever Hamas asks for aid, Defendants step up— and Hamas thanks them. JA77–80 (collecting examples). Without Defendants' support of "knowingly serving as the propaganda and recruiting wing of a Foreign Terrorist Organization in the United States," JA32, Hamas's goals would be unachievable.

Given these troubling facts, Plaintiffs sued to hold Defendants liable for materially supporting Hamas. *Amici* States file this brief to express their interest in ensuring that Plaintiffs have their day in court.

## ARGUMENT

Plaintiffs have alleged that Defendants follow in the footsteps of their predecessor organizations—organizations that courts across the country have found materially support the foreign terrorist organization Hamas. This Court should reverse the district court's order dismissing the complaint and allow the claims to proceed against Defendants—each of whom is plausibly alleged to have materially supported terror.

*Amici* States focus on three key aspects of the litigation for the Court: first, why States have an interest in ensuring this case proceeds; second, why this ATA suit may be the only method for these victims of terror to receive financial compensation for their losses at the hands of terrorists and their supporters; and third, how recent Supreme Court precedent calls for a flexible application of the ATA in a way that accomplishes its broad purposes.

## I. States have an interest in ensuring supporters of terrorism are held accountable

Terrorism is a crime in America—both at the federal level and in many States. So too is material support for terrorism. To combat terrorism, the federal government, state governments, and private citizens have various tools in their toolkits to hold terrorists and their supporters accountable. *Amici* States have a strong interest in ensuring that terrorists pay for their crimes.

The federal government and States often have complementary roles in the criminal prosecution of terrorism. The federal government can prosecute international terrorism based on its constitutionally enumerated powers to regulate commerce between States and with foreign nations, to define and punish "Offences against the Law of Nations," to declare war, and to make treaties. See, *e.g.*, Pub. L. No. 104-132, § 301(a). As for States, they can prosecute domestic terrorism occurring within their borders based on their traditional police powers to suppress violent crime. See *United States v. Morrison*, 529 U.S. 598, 618 (2000) (describing the power to suppress violent crime as "denied [to] the National Government and reposed in the States"). "[D]ue in part to the uneven federalization of terrorism, federal prosecutors handle most

10

international terrorism cases while local prosecutors frequently charge domestic terrorism under state law." Shirin Sinnar, *Separate and Unequal: The Law of "Domestic" and "International" Terrorism*, 117 Mich. L. Rev. 1333, 1339 (2019). States are not precluded from prosecuting international terrorism, however; rather, States "can exercise criminal jurisdiction over international terrorism committed or threatened within their borders where state law does not conflict with federal law." *Id.* at 1379.

And these laws are effective: for example, the Commonwealth of Virginia successfully prosecuted a would-be terrorist under its terrorism statute for planning a pipe bomb attack on a school. See *Bay v. Commonwealth*, 729 S.E.2d 768, 770 (Va. App. 2012). Virginia's antiterrorism statutes provided the basis for multiple charges that led to conviction. Authority to pursue terrorism and terroristic threats is a necessary part of the States' police power and law enforcement authority.

Federal law has also long made the knowing provision of material support to designated foreign terrorist organizations like Hamas illegal. See, *e.g.*, 18 U.S.C. § 2339B. The federal statute defines material support to include "any property, tangible or intangible, or service, including

currency or monetary instruments . . . expert advice or assistance . . . communications equipment, facilities . . . and transportation, except medicine or religious materials." *Id.* § 2339A. Many States similarly prohibit providing material support for terrorism. For example, Iowa criminalizes "provid[ing] material support or resources to a person who commits or attempts to commit terrorism." Iowa Code ch. 708A.4. And in Virginia, an entity violates the law if it "knowingly provides any material support (i) to an . . . organization whose primary objective is to commit an act of terrorism and (ii) does so with the intent to further such . . . organization's objective." Va. Code § 18.2-46.5.

Iowa and Virginia are not the only States with such laws: Alabama, Arizona, Arkansas, Florida, Illinois, Indiana, Louisiana, Michigan, Missouri, Nevada, New Jersey, Ohio, Pennsylvania, and Tennessee all have their own material-support statutes.[2] States enforce these material

---

[2] See Ala. Code § 13A-10-153, Ariz. Rev. Stat. Ann. § 13-2308.01, Ark. Code Ann. § 5-54-202, Fla. Stat. Ann. § 775.33, 720 Ill. Comp. Stat. Ann. 5/29D-29.9, Ind. Code § 35-46.5-2-5, La. Civ. Code Ann. art. 2315.9, Mich. Comp. Laws Ann. § 750.543k, Mo. Rev. Stat. Ann. § 576.080, Nev. Rev. Stat. Ann. § 202.445, N.J. Rev. Stat. 2C:38-5, Ohio Rev. Code Ann. § 2909.22, 42 Pa.C.S. § 8318, Tenn. Code § 39-13-807.

support statutes to ensure that their citizens are protected from would-be terrorists and their supporters.

Combatting terrorism does not end with criminal prosecution. Federal law allows those affected by terrorist attacks to seek civil damages from supporters of terrorism. See Part II, *supra*. So too do certain States, where state antiterrorism acts create a private right of action for those injured by terrorism—including by those providing material support for terrorists. See, *e.g.*, Fla. Stat. § 775.30; 42 Pa.C.S. § 8318 (creating private right of action to pursue remedies against a "person who knowingly provided material support or resources to or aided a terrorist or terrorist organization"). In one prominent case under Florida's statute, for instance, plaintiffs sued to recover against defendants that knowingly provided material support for terrorism by selling drugs, the profits of which would be remitted to foreign terrorist organization Fuerzas Armadas Revolucionarias de Colombia (more commonly known as FARC). *Osio v. Moros*, 2023 WL 5019877, at *4 (S.D. Fla. July 19, 2023), *report and recommendation adopted*, 2023 WL 5015435 (S.D. Fla. Aug. 7, 2023) (citing Fla. Stat. § 775.30). Florida's law allowed the plaintiffs to pursue their claims alleging material support.

This type of enforcement action complements the federal framework and shows how important it is to allow private rights of action—when authorized by statute—to enforce antiterrorism laws.

States have vital interests in ensuring the safety and security of their citizens and attempt to do so through state law. Indeed, many States have enacted analogues and complements to the federal antiterrorism laws—including private rights of action for persons injured by those who provide material support for terrorists and terror organizations. The facts presented here are incredibly disturbing. At the motion to dismiss stage, construing all facts in Plaintiffs' favor, the district court should have held that Plaintiffs have grounds to proceed on the ATA claims. Allowing Plaintiffs to proceed will allow for justice here to be done.

## II.　The ATA is the most effective tool for these Plaintiffs to attempt to receive compensation from Defendants

Although criminal prosecution can hold terrorists and their supporters accountable, a private right of action for damages is the most effective method for the actual victims of terrorism to be compensated. The federal ATA was created for this exact purpose, and this Court should not shut the courthouse doors for Plaintiffs who have put forward

credible allegations that they were seriously injured by Defendants'
material support of terror in the horrific October 7 attacks.

The ATA was passed precisely to provide plaintiffs like the ones
here a civil cause of action for damages. In 1986, Congress had passed
legislation that provided extraterritorial *criminal* jurisdiction for acts of
international terrorism against U.S. nationals. See H.R. Rep. No. 102-
1040, at 5. But a subsequent case showed Congress that there was a "gap"
in this country's "efforts to develop a comprehensive legal response to
international terrorism." *Ibid.* After a cruise passenger was executed and
thrown overboard by terrorists, his widow and family pursued legal
remedies against the terrorists in the courts of their home state of New
York. *Ibid.* "Only by virtue of the fact that the attack violated certain
Admiralty laws and that the organization involved—the Palestine
Liberation Organization—had assets and carried on activities in New
York, was the court able to establish jurisdiction over the case." *Ibid.* A
similar attack "occurring on an airplane or in some other locale might not
have been subject to civil action in the U.S." *Ibid.*

Congress thus passed the expansive ATA statute. The ATA permits
civil claims for injuries caused by an "act of international terrorism." 18

U.S.C. § 2333(a). "International terrorism" is defined as activities that "occur primarily outside the territorial jurisdiction of the United States" or "transcend national boundaries" in "the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." *Id.* § 2331(1)(C). "International terrorism" is contrasted with "domestic terrorism," which is limited to activities that "occur primarily within the territorial jurisdiction of the United States." *Id.* § 2331(5)(C).

The ATA was meant to "codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law." *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1010 (7th Cir. 2002). The Act "accords victims of terrorism the remedies of American tort law, including treble damages and attorney's fees." *Ibid.* (quoting 137 Cong. Rec. S4511-04 (April 16, 1991)). The Act is "powerfully broad" and is meant to "bring in all of the substantive law of the American tort law system." *Ibid.* (quoting *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on

the Judiciary, United States Senate, 101st Congress, Second Session, July 25, 1990, Testimony of Joseph Morris, at 136 (brackets omitted)).

Congress thus created the ATA to overcome obstacles to holding terrorists accountable in American courts. Congress recognized that allowing private civil actions for these horrific attacks would not only provide remedies to the victims of terror but also could provide "an important instrument in the fight against terrorism," *Antiterrorism Act of 1991*, Hearing Before the Subcomm. on Intellectual Property & Judicial Admin. of the H. Comm. on the Judiciary, 102d Cong. 10 (1992), at 10 (letter from Sen. Grassley), by striking at "the resource that keeps [international terrorists] in business – their money," 138 Cong. Rec. S17252-04 (1992) (statement of Sen. Grassley). The ATA reaffirmed America's "commitment to the rule of law," under which "the people of the United States" could "bring terrorists to justice the American way, by using the framework of our legal system to seek justice against those who follow no framework or defy all notions of morality and justice." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of the Senate Committee on the Judiciary, 101st Cong., 2nd Sess., at 2–3 (July 25, 1990).

17

The ATA is thus a critical tool for citizens of *Amici* States to receive compensation for the effects of horrific acts of international terrorism, like the October 7 attacks. Although the treble damages provision of the ATA was intended to punish terrorists, it also serves the important purpose of attempting—in some small way—to make victims whole after life-altering events. See *Stansell v. Revolutionary Armed Forces of Columbia*, 2022 WL 17830551, at *5 (S.D.N.Y. Dec. 21, 2022) (The ATA "reflects both a desire to punish terrorists via criminal and civil penalties and to compensate victims of terrorism."). Indeed, "it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives." *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003).

The ATA's legislative history "reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013). Thus, "[t]reble damages under the ATA are compensatory damages because they are remedial in nature, and function, in essence, as a form of liquidated damages." *Stansell*, 2022 WL 17830551, at *3. ATA damage awards can "compensate the estates of

victims and their family members for non-economic harms such as pain and suffering, loss of companionship and mental anguish." *Id.* at *6; *see also Knox v. Palestine Liberation Org.*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006) (awarding damages for "loss of consortium, loss of companionship, society and guidance, and damages for mental anguish"); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216 (D.D.C. 2008) (awarding damages for loss of consortium and pain and suffering); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 239 (D.R.I. 2004).

Virginia, unlike certain other States, does not have a private right of action for victims of terrorism to seek damages from the supporters of terrorism. Thus, it would be difficult to receive damages against AMP under the state law of Virginia, where AMP has its principal place of business. See JA35. The ATA is likely Plaintiffs' only avenue to receive compensation for the horrific crimes perpetrated against them. This Court should reverse the dismissal of Plaintiffs' ATA claims so that AMP and NSJP cannot escape liability without Plaintiffs having a chance to prove their case.

A civil action may also be effective here given AMP's conduct in an ongoing governmental investigation. The Virginia Attorney General has launched an investigation into AMP for potential violations of Virginia's laws, including allegations that AMP may have used funds raised for impermissible purposes, such as "benefitting or providing support to terrorist organizations." See JA52 (quoting News Release, Jason Miyares, Attorney General of Virginia, Attorney General's Office Opens Investigation Into American Muslims for Palestine Nonprofit (Oct. 31, 2023)).

But rather than comply with the investigation, AMP sued the Attorney General in the Circuit Court for the City of Richmond. See JA95. A state court judge rejected AMP's attempt to set aside the Attorney General's request for information, see News Release, Jason Miyares, Attorney General of Virginia, Virginia Court Orders American Muslims for Palestine to Produce Records Requested by Attorney General Miyares, https://tinyurl.com/yy7ryuck, but the point remains that AMP has stonewalled a legitimate investigation into its potential material support of terror. This investigation into AMP remains ongoing and, while it may help bring justice to the victims of the October 7

attacks, it will not give those victims financial compensation. For that reason, this Court should reverse the dismissal of Plaintiffs' ATA claims and should allow them to have their day in court.

## III. Recent Supreme Court opinions highlight the need for flexibility and broad interpretation in ATA cases

Civil antiterrorism cases will often involve complicated—and tragic—facts. Beyond the statute, a body of jurisprudence has built up explaining when, and how, perpetrators may be held responsible. In the last few years, the Supreme Court has issued opinions in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), and *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), that shed light on the proper interpretation of the ATA. Both cases highlight the need for flexibility and a broad interpretation of the ATA in cases like this. This Court should especially heed *Twitter*, as overinterpreting the ATA to defeat its purpose was the key analytical error that led to the district court's wrongful dismissal of the ATA claims.

*First*, *Twitter* recognized the need for flexibility in ATA cases. That case emphasized that aiding and abetting law must be applied flexibly "to impose liability on those who consciously and culpably participated in the tort at issue." *Twitter*, 598 U.S. at 506. Plaintiffs' allegations should have survived a motion to dismiss under this standard.

21

Under federal law, a person "who aids and abets, by knowingly providing substantial assistance" to a foreign terrorist organization ("FTO") may be held liable for the acts of international terrorism that the person aided and abetted. 18 U.S.C § 2333(d)(2). While "[n]othing in the statute defines any of those critical terms," they are "familiar to the common law, which has long held aiders-and-abettors secondarily liable for the wrongful acts of others." *Twitter*, 598 U.S. at 484.

In reaching its decision on aiding and abetting, the district court cited the "three-element and six-factor test" from *Halberstam*. *Cf. Twitter*, 598 U.S. at 488 (citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)); see JA187–88. But the Supreme Court recognized *Halberstam* "may not be entirely adequate" when dealing with "international terrorist networks and world-spanning internet platforms." *Twitter*, 598 U.S. at 487–88. Instead, courts should "ascertain the 'basic thrust' of *Halberstam*'s elements" and "the common law of aiding and abetting upon which *Halberstam* rested." *Id.* at 488. In doing so, they can recognize that "[b]y their very nature, the concepts of aiding and abetting and substantial assistance do not lend themselves to crisp,

bright-line distinctions" like those used by Defendants in this case. *Id.* at 506.

Of course, the *Halberstam* test still matters: Section 2333(d)(2) "points to the elements and factors articulated by *Halberstam*." *Twitter*, 598 U.S. at 497. But the factors should be "applied as a framework designed to hold defendants liable when they consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'" *Id.* at 497 (citation omitted). In other words, the *Halberstam* framework must yield to the purpose of aiding and abetting liability. The "fundamental question of aiding-and-abetting liability" is "[d]id defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?" *Id.* at 505.

In *Twitter*, plaintiffs sued Facebook, Twitter, and Google, alleging that an FTO used their social media platforms to recruit and raise funds. *Twitter*, 598 U.S. at 478. The plaintiffs plausibly alleged that defendants knew both that the FTO committed torts and that defendants themselves were "playing some sort of role in [the FTO's] enterprise." *Id.* at 497. But the plaintiffs failed to allege that defendants gave "knowing and substantial assistance," because plaintiffs relied on negligence, rather

23

than on culpable action. *Id*. at 498; *see also id*. at 500 ("[T]he claim here rests less on affirmative misconduct and more on an alleged failure to stop ISIS from using these platforms."). The plaintiffs did not plead that Twitter or the other defendants "culpably 'associate[d themselves] with'" the tortious act, gave the FTO "any special treatment or words of encouragement," or "carefully screened any content before allowing users to upload it onto their platforms." *Id*. at 498–99. Ultimately, the plaintiffs failed to show "that defendants treated [the FTO] any differently from anyone else." *Id*. at 500.

Unlike in *Twitter,* Plaintiffs here plausibly claim Defendants consciously, voluntarily, and culpably assisted Hamas's terrorist attacks. Plaintiffs allege that Defendants had prior knowledge of the October 7 attacks based on the speed with which Defendants responded to the attack and the use of graphics that suggest insider information about the attack. See, *e.g.*, JA60–63.

Defendants knew they were distributing Hamas propaganda because materials they posted and handed out were marked with Hamas logos and designations. See, *e.g.*, JA60–63. The toolkit Defendants used after October 7 further identified its creators as part of a "Unity Intifada"

operating "under unified command" in Gaza. JA62. For these reasons and because FTOs including Hamas thanked Defendants, JA79, Defendants were aware they were aiding an FTO and continued to provide such assistance. Here, "defendants consciously, voluntarily, and culpably participate[d] or support[ed] the relevant wrongdoing." *Twitter*, 598 U.S. at 505.

Just like the defendants in *Twitter*, Defendants here "overstate the nexus that § 2333(d)(2) requires between the alleged assistance and the wrongful act." *Twitter*, 598 U.S. at 495. Aiding and abetting "does not require the defendant to have known 'all particulars of the primary actor's plan.'" *Ibid*. Defendants in this case do not need to have had personal knowledge of any of the specific torts committed against Plaintiffs (like kidnapping or murder) because "[a]s *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort." *Id*. at 496. "[E]ven more remote support can still constitute aiding and abetting in the right case." *Ibid*.

The district court erred in holding that allegations about Defendants' pro-Hamas "public relations" campaign "cannot satisfy

Plaintiffs' burden here." JA181. "[A]iding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts." *Twitter*, 598 U.S. at 489–90. Aiding and abetting is grounded in "culpable misconduct" because it requires "the defendant . . . to take some 'affirmative act' 'with the intent of facilitating the offense's commission.'" *Id*. at 490. "Such intentional participation can come in many forms, including . . . encouraging . . . the commission of the offense, such as through words of encouragement." *Ibid*. "For example, *Halberstam* recognized that giving verbal encouragement (such as yelling 'Kill him!') could be substantial assistance." *Id*. at 492.

"Moreover, in appropriate circumstances, a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *Twitter*, 598 U.S. at 496. "At this point, aiding-and-abetting liability begins to blur with conspiracy liability, which typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy." *Ibid*. The Supreme Court noted it "cannot rule out the possibility that some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all of the

group's actions or perhaps some definable subset of terrorist acts." *Id*. at 502. Beyond Defendants' propagandizing on Hamas's behalf, the complaint describes how Hamas, through its affiliate AMP, *operates* Defendants. JA64–65. Discovery is necessary to further show the systematic ties between Defendants and Hamas and identify additional intermediaries.

*Second*, the Court breathed new life into the ATA in *Fuld*, illustrating the importance of broadly interpreting the statute. When Congress and the President align on an issue of foreign policy, including holding terrorism supporters accountable, the courts do not "cavalierly interfere with" their "delicate judgments." *Fuld*, 606 U.S. at 19. In *Fuld*, the Supreme Court affirmed the viability of actions brought under various antiterrorism acts. *Id*. at 25. In enacting antiterrorism laws, "Congress and the President made a considered judgment to subject" violators "to liability in U.S. courts as part of a comprehensive legal response to 'halt, deter, and disrupt' acts of international terrorism that threaten the life and limb of American citizens." *Id*. at 19–20 (quoting H.R. Rep. No. 115–858, at 7–8 (2018)). That makes sense because "[c]ombating terrorism is . . . 'an urgent objective of the highest order.'"

27

*Id.* at 20 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).

And the Supreme Court recognized that the federal government "has a strong interest in permitting American victims of international terror to pursue justice in domestic courts." *Fuld*, 606 U.S. at 20. At times, facilitating "adjudication of ATA claims" is "'vital' to 'furthering the safety of Americans abroad, facilitating compensation for injuries or death, and deterring international terrorism.'" *Ibid.* (quoting Brief for United States, *Fuld v. Palestine Liberation Org.*, Nos. 24-20 & 24-151 (U.S. Jan. 13, 2025) & Brief for Senator Charles Grassley, *et al.*, *Fuld v. Palestine Liberation Org.*, Nos. 24–20 & 24–151 (U.S. Aug. 8, 2024)).

*Fuld* involved personal jurisdiction over certain foreign terror groups and applied the narrower Promoting Security and Justice for Victims of Terrorism Act rather than other antiterrorism statutes. *Fuld*, 606 U.S. at 8. While it is not directly on point, it is the most recent evidence of the Supreme Court's desire for America's antiterrorism laws to be judiciously used to hold accountable terrorists and their supporters. The Court's sweeping language and clear guidance on a related statute

28

instructs lower courts to effectuate Congress's validly enacted antiterrorism statutes.

## CONCLUSION

For these reasons, this Court should reverse and remand for further proceedings.

December 30, 2025                Respectfully submitted,


JASON S. MIYARES                  BRENNA BIRD
Attorney General of Virginia      Attorney General of Iowa

*/s/ Kevin M. Gallagher*          */s/ Eric H. Wessan*
KEVIN M. GALLAGHER                ERIC H. WESSAN
*Solicitor General*               *Solicitor General*

Office of the Attorney General    Hoover State Office Building
202 North Ninth Street            1305 East Walnut Street
Richmond, Virginia 23219          Des Moines, Iowa 50319
(804) 786-2071 – Telephone        (515) 823-9117 / (515) 281-5191
(804) 786-1991 – Facsimile        (515) 281-4209 (fax)
kgallagher@oag.state.va.us        eric.wessan@ag.iowa.gov

*Counsel for the Commonwealth*    *Counsel for the State of Iowa*
*of Virginia*

## COUNSEL FOR ADDITIONAL AMICI STATES

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commw. of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

DAVID W. SUNDAY, JR.
Attorney General
Commw. of Pennsylvania

ALAN WILSON
Attorney General
State of South Carolina

MARTY J. JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

KEITH KAUTZ
Attorney General
State of Wyoming

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 29(b), I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(4) because it contains 5,399 words, excluding those parts exempted by Fed. R. App. P. 32.

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements because the text of the electronic brief is identical to the text of the paper copy and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

December 30, 2025          */s/ Kevin M. Gallagher*
                          KEVIN M. GALLAGHER
                          *Solicitor General*

                          *Counsel for the Commonwealth of Virginia*

32

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on December 30, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

December 30, 2025                     /s/ Kevin M. Gallagher
                                     KEVIN M. GALLAGHER
                                     *Solicitor General*

                                     *Counsel for the Commonwealth of Virginia*

33